UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| VERITAS INDEPENDENT PARTNERS, LLC, and on behalf of all others similarly situated, | : : : : | Case No. 1:18-cv-769 |
| Plaintiff, | : : | |
| v. | : : | |
| THE OHIO NATIONAL LIFE INSURANCE COMPANY; OHIO NATIONAL LIFE ASSURANCE CORPORATION; OHIO NATIONAL EQUITIES, INC.; and OHIO NATIONAL FINANCIAL SERVICES, INC., | : : : : : : : | |
| Defendants. | : | |

## CLASS ACTION COMPLAINT

Plaintiff Veritas Independent Partners, LLC ("Veritas"), individually and on behalf of all others similarly situated (the "Class"), brings this action arising out of Defendants' class-wide and unlawful decision to stop paying contractually agreed-upon trail commissions due to independent broker/dealers.

## PARTIES

1. Plaintiff Veritas Independent Partners, LLC is an Arkansas limited liability company with a principal place of business at 2201 Washington Avenue, Suite 2, Conway, Arkansas 72034. Veritas's two members are citizens of and reside in Arkansas.  Veritas is an independent broker dealer registered with the FINRA.

2. Veritas offers investment and advisory products and services directly to retail customers through representatives who are licensed and registered with FINRA, with the United States Securities and Exchange Commission and with state insurance agencies.

1

3. Some of the financial products selected by Veritas to be available to its representatives for sale and servicing to clients are created by third parties such Ohio National, with whom Veritas enters into selling and/or servicing agreements.

4. In those circumstances, the revenue Veritas receives is based on the commissions paid by those third parties, including Ohio National, on the financial products sold through Veritas.

5. Defendant The Ohio National Life Insurance Company is a corporation organized under the laws of Ohio, with a principal place of business at One Financial Way, Cincinnati, Ohio 45242.  The Ohio National Life Insurance Company is a wholly-owned subsidiary of Ohio National Financial Services, Inc., which has the same principal place of business.

6. Defendant Ohio National Life Assurance Corporation is a corporation organized under the laws of Ohio, with a principal place of business at One Financial Way, Cincinnati, Ohio 45242. Ohio National Life Assurance Corporation is a wholly-owned subsidiary of The Ohio National Life Insurance Company.

7. Defendant Ohio National Equities, Inc. is a corporation organized under the laws of Ohio, with a principal place of business at One Financial Way, Cincinnati, Ohio 45242.  Ohio National Equities, Inc. is an independent broker dealer registered with FINRA.  Upon information and belief, Ohio National Equities, Inc. is a wholly-owned subsidiary of The Ohio National Life Insurance Company.

8. Defendant Ohio National Financial Services, Inc. is a corporation organized under the laws of Ohio, with a principal place of business at One Financial Way, Cincinnati, Ohio 45242. Ohio National Financial Services, Inc. is the sole parent of The Ohio National Life Insurance Company.

## JURISDICTION AND VENUE

9. Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332. The Ohio National defendants are corporations incorporated under the laws of Ohio with principal places of business in Ohio, and the amount in controversy exceeds $5,000,000.

10. This Court has jurisdiction over Ohio National because its principal place of business is in this District.

11. Ohio National conducted and solicited business in the Southern District of Ohio, engaged in a persistent course of conduct in Ohio and/or derived substantial revenues from goods or services used in the Southern District of Ohio, and engaged in conduct in Ohio which caused foreseeable injuries to Plaintiff and the Class.

## ADDITIONAL FACTS

12. In 2014, Defendants The Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, Ohio National Equities, Inc., and Ohio National Financial Services, Inc. (collectively, "Ohio National" and/or "Defendants") and Veritas entered into a Selling Agreement, pursuant to which, among other things, Veritas agreed to sell Ohio National's variable annuity contracts through Veritas's representative sales agents with commissions to be paid under a Schedule of Commissions. True and accurate copies of the relevant portions of the Selling Agreement and the Schedule of Commissions ("Commission Schedule") are attached hereto as Exhibits A and B.

13. Upon information and belief, Defendants had entered into thousands of the same or substantially similar selling agreements with the thousands of members of the Class for over a decade, all of which expressly provide that Ohio law shall govern the agreements.

14. One of the contracts to be sold by Plaintiff and the Class in accordance with the Selling Agreement was a variable annuity with a Guaranteed Minimum Income Benefit Rider ("GMIB Annuity Contract" or the "Contracts").

15. The GMIB Annuity Contract provides a guaranteed retirement income for life, regardless of the performance or value of the underlying contract investments.

16. The GMIB Annuity Contract is sold to a client through Plaintiff and the Class in exchange for a lump sum premium paid to Ohio National at the time of purchase (the client or clients are hereinafter referred to as the "Clients" or the "Annuity Contract Owner").

17. The GMIB Annuity Contract provides that the amount of the annual income is derived by taking the higher of a fixed percentage of either the investor's account value or a fixed guaranteed minimum. Even if a combination of underperforming investments, contract fees and income distributions in the account value were to cause the annuity's account value to fall to zero, Ohio National is nonetheless still responsible for continuing a certain level of guaranteed income for the lifetime of the client.

18. Upon information and belief, recently Ohio National concluded the pool Ohio National's GMIB Annuity Contracts were unprofitable to Ohio National.

19. Consequently, Ohio National decided that it was in its best interest to exit as many existing GMIB Annuity Contracts as possible; and where it could not do so, Ohio National decided to eliminate paying commission obligations to the Class and Plaintiff, irrespective of Defendants' agreements with the Class and Plaintiff. On information and belief, the decision to exit the annuity business and stop paying Ohio National's contractually obligated commissions was made and directed by the parent corporation, Ohio National Financial Services, Inc.

20. As set forth below, Ohio National cannot do so without breaching its contractual obligations under the Selling Agreement.

21. Under the Selling Agreement, Ohio National appointed Veritas to sell its Contracts: "ONL ... hereby appoint[s] BD to supervise solicitations of the Contracts, and to facilitate solicitations of sales of the Contracts which are described in the Schedule(s) of Commissions attached hereto." See Ex. A, ¶1.

22. Commissions payable in connection with the Contracts shall be paid to Plaintiff and the Class "according to the Commission Schedule(s) relating to this Agreement as they may be amended from time to time *and in effect at the time the Contract Payments are received by [Ohio National]*." See Ex. A, ¶9.

23. Veritas transfers all premiums paid on each sold Contract to Ohio National with the Contract application, so Ohio National receives Contract payments up front. See Ex. A, ¶8.

24. The Commission Schedule under the Selling Agreement identified three types of commissions that could be paid on a Contract: commissions on initial premiums; commissions on add-on premiums; and trail commissions. See Ex. B.

25. The Commission Schedule provided that for the Contracts, Veritas or its representatives could choose from commission pay out options. See Ex. B, at 2-5.

26. This case is about the trail commissions.

27. A trail commission is compensation based on both the premiums paid by the customer and the earnings on those premiums that is deferred by Veritas for at least a year, and that lasts until the Contract is annuitized or surrendered.

28. Specifically, the Commission Schedule allowed Veritas or its representatives to choose to be paid a greater amount upon the initial sale of the Contracts, or to be paid more evenly (in the form of a trail commission) over the life of the Contract. See Ex. B, at 1.

29. As set forth in part of the Commission Schedule below for the ONcore Premier FPDA Contracts, for example, Veritas and its representatives were presented with five different "Options" to choose from for a commission, and the amount of up front commissions was dependent upon the amount of trail commission chosen. The smaller the up front lump sum commission selected, the larger the trail commission paid out:

**COMMISSIONS FOR PURCHASERS AGE 80 and UNDER**

| | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| Initial Premium[1] | 6.00% | 5.00% | 1.00% | 7.00% | 3.00% |
| Add-on premiums | 6.00% | 5.00% | 1.00% | 7.00% | 3.00% |
| Trails[2] | | | | | |
| Deposit Yrs 2-6 | 0.00% | 0.25% | 1.00% | 0.00% | 0.80% |
| Deposit Yrs 7 + | 1.00% | 1.00% | 1.00% | 0.00% | 0.80% |

See Ex. B, at 2; see also id. at 3-5.

30. The Commission Schedule in place at the time of the sale of the Contracts at issue here also expressly provided that the trail commissions would continue to be paid to the Plaintiff and the Class not only during the life of the Selling Agreement, but also as to each particular Contract, for so long as that Contract remained live: "Trail commissions will continue to be paid to the broker dealer of record while the Selling Agreement remains in force *and on any particular contract until the contract is surrendered or annuitized*." See Ex. B, at 2-5.

31. Nonetheless, Ohio National has sought to skirt its obligations to the Plaintiff and the Class.

32. First, Ohio National sought to buy its way out of the situation by encouraging Plaintiff and the Class to "sell" clients on the benefit of an alternative investment.

6

33. Expecting that would alone be insufficient to exit their obligations, Ohio National tortiously devised a scheme to save money by refusing to pay owed trail commissions to Veritas and the Class on GMIB Annuity Contracts.

34. Ohio National initiated this scheme by announcing in September of this year to the Plaintiff and the Class that it was terminating the Selling Agreement, and informed Veritas and the Class that trail commissions would not be paid post-termination, notwithstanding the unambiguous terms of the Selling Agreement's Commission Schedule, which specifically provides – among other language that vests the right to a trail commission – that Ohio National will pay trail commissions to Plaintiff and the Class of broker/dealers "on a particular contract until the contract is surrendered or annuitized."

35. A true and accurate copy of Ohio National's September 21, 2018 letter ("Termination Letter") to Plaintiff is attached hereto as Exhibit C. Upon information and belief, it is similar to those sent by Ohio National contemporaneously to thousands of other independent broker/dealers, including Class Members.

36. Second, Ohio National, however, understood that the Plaintiff and the Class would not want to leave their Clients without any assistance and Defendants – without compensating Plaintiff and the Class – hoped to pass on to Plaintiff and the Class the ongoing costs associated with transferring the Clients to other products, as well as servicing the Clients on non-transferred Contracts.

37. So, on the same day Defendants sent the Termination Letter, Ohio National sent a letter to the Plaintiff and the Class advising that they could still have access to the Clients' information at Ohio National so they can continue to service those clients, just without any compensation.

7

38. Servicing a client on a Contract is complicated, however, and requires an analysis of, among other things: the amount of withdrawals allowed per year on the Contract; the timing of withdrawals; the timing of annuitization; and the expected return per year from the annuity contract. Deciding whether a Contract should be surrendered or exchanged for another product is likewise complicated.

39. Upon information and belief, therefore, it is Defendants' expectation that they may be able to lower their exposure on certain Contracts by causing broker/dealers to transfer clients who have purchased the Contracts to alternative products.

40. In furtherance of this effort, Defendants have decided to directly attempt to convince Plaintiff's and the Class's clients to give up their Contract benefits.

41. In an email dated October 29, 2018, Ohio National notified Plaintiff and the Class:

> From November 12, 2018 through February 11, 2019, Ohio National is offering the opportunity for eligible clients to participate in a Buyout offer of their ... variable annuity contract with Guaranteed Minimum Income (GMIB) rider. By accepting this offer, clients will be cancelling their variable annuity contracts and all attached riders in exchange for an Enhanced Contract Value, which they may receive as a cash surrender or transfer to a financial product available from another financial institution.

("Buyout Offer.")

42. In that same email, Ohio National made it clear that it was going directly to the client with the Buyout Offer: "The following items accompany this letter: A list of clients eligible for the offer[;] A sample of the letter your eligible client will receive[;] a copy of the GMIB Buyout Offer Acceptance form[.]" Id.

43. Ohio National's unlawful conduct is thus intended to extract extra work from the Plaintiff and the Class but cut off the payment of the trail commissions to Plaintiff and the Class they are entitled to receive. More troubling, that illicit effort seemed designed to pressure Plaintiff to

8

counsel their clients to purchase substitute financial products or result in advisors providing less service to GMIB Annuity clients, thereby increasing the chances Ohio National will get the result it seeks—surrender of the GMIB Annuity Contracts.

44. Plaintiff seeks a declaratory judgment concerning the disputed rights and obligations under the Selling Agreement, as well as specific performance and/or monetary remedies for breach of contract.

45. This conduct is widespread and uniform. Upon information and belief, hundreds or thousands of members of the Class are due the payment of trail commissions on the Contracts and are currently servicing those Contracts.

46. Upon information and belief, Ohio National pays tens of millions of trail commissions on these Contracts each year to Plaintiff and the Class and has likely calculated, identified, and recognized the contingent liability on their financial statements.

47. Ohio National now intends to retain the tens of millions of dollars annually in trail commissions it otherwise would have paid Plaintiff and the Class if the Selling Agreement were honored.

48. Ohio National's improper conduct has caused and is continuing to cause damage and irreparable harm to Plaintiff, including the loss of goodwill and the negative impact upon Plaintiff's and the Class's relationships and reputation.

## CLASS ACTION ALLEGATIONS

49. Plaintiff brings this suit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all members of the following Class:

> All broker-dealers who Defendants notified in September of 2018 that Defendants were terminating the Selling Agreement and that all annuity trail compensation would cease to be paid by Defendants on GMIB Annuity Contracts.

50. Excluded from the Class are: (1) all judicial officers presiding over this matter and members of their families; (2) Defendants, their subsidiaries, parents, successors, predecessors, affiliates over which they have a controlling interest, and their current or former employees, registered and/or securities representatives, officers, and directors; (3) counsel for Plaintiff and Defendants (and employees of their firms); and (4) legal representatives, successors, or assigns of excluded persons.

51. The Class fulfills Federal Civil Rule 23(a).

52. The Class is so numerous that joinder of all members is impracticable. Upon information and belief, variable annuities represented the bulk of Defendants' assets under management — $23.6 billion, or about 56% of the total, at the end of 2017. Upon information and belief hundreds if not thousands of independent broker/dealers are owed trail commissions for Contracts under Selling Agreement that Defendants terminated in September 2018 with the accompanying announcement that trail commissions would not be paid.

53. The identities of Class Members are easily ascertainable through Ohio National's electronic records.

54. Common questions of law and fact exist as to all Class Members that predominate over any questions affecting only individuals Class Members, including but not limited to, the following:

    a. Whether Ohio National entered into a Selling Agreement that provided trail commissions would be owed to the broker/dealer on particular Contracts until the Contract is surrendered or annuitized;

    b. Whether Ohio National provided notice that it was terminating the Selling Agreement;

    c. Whether Ohio National repudiated the agreement by announcing that it would no longer pay trail commissions under those Selling Agreements on the Contracts after the termination;

    d. Whether Ohio National breached the Selling Agreement by terminating the Agreement and advising it would no longer pay trail commissions;

    e. Whether Ohio National Financial Services, Inc. induced or caused the other Ohio National Defendants to breach the Selling Agreement;

    f. Whether Ohio National is liable to Plaintiff and Class Members for that breach;

    g. Whether Plaintiff and Class Members are entitled to damages; and

    h. Whether Plaintiff and the Class are entitled to declaratory relief and/or injunction to enforce the terms of the Selling Agreement.

55. Each of the Class Member's Selling Agreements is substantially similar, by – among other things – providing that Defendants shall pay Plaintiff and each Class Member trail commissions on each particular contract until the contract is surrendered or annuitized under a substantially similar or same Commission Schedule.

56. The evidence to demonstrate Defendants' conduct will be common to the Class, establishing a class-wide claim, including but not limited to termination letters, notices to Class members, testimony about the class-wide decision to terminate trail commissions, and internal accounting records of Defendants (including but not limited to reserves and other liabilities recognized by Defendants on their books for trail commissions) that will be used to demonstrate the amount of damages owed to the Class.

57. Plaintiff's claims are typical of the claims of the Class it will represent. Plaintiff and all Members of the proposed Class have suffered similar injuries as a result of the same alleged illegal practices.

58. Plaintiff has no interests adverse to the interests of the other Class Members.

59. Plaintiff will fairly and adequately protect the interests of the Class.

60. Plaintiff has retained attorneys well experienced in class actions and complex litigation.

61. The Class satisfies both Federal Civil Rules 23(b) and 23(c). Defendants have acted and continue to refuse to act in ways that apply generally to the proposed class, thereby making final injunctive relief or declaratory relief described herein appropriate for the benefit of the entire Class, questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy which is the subject of this action.

62. Certification of one or more subclasses or issues may be appropriate for certification under Federal Civil Rule 23(c).

63. The interests of judicial economy will be served by concentrating litigation concerning these claims in this Court, and the management of the Class will not be difficult.

64. Defendants have caused injury and damages to Plaintiff and the Class through the above conduct.

65. A class action is needed to afford Plaintiff and Class Members of their contractual rights and without it Defendants will continue to injure Plaintiff and the Class.

## CAUSES OF ACTION

### COUNT I
### Declaratory Judgment Relief (28 U.S.C. §§ 2201-2202)

66. Plaintiff repeats, realleges and incorporate by reference the allegations contained in the preceding paragraphs as if fully stated herein.

67. Plaintiff requests that this Court declare that: both prior to and after the termination of the Selling Agreement, Defendants are obligated pursuant to the Selling Agreement to pay all trail commissions to Plaintiff and the Class on all Contracts until any particular contract is surrendered or annuitized.

68. There is an actual and justiciable controversy between the parties with regard to these issues.

### COUNT II
### Breach of Contract

69. Plaintiff repeats, realleges and incorporates by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

70. Ohio National and Plaintiff, as well as the Class, are parties to the Selling Agreement, which is a binding and enforceable contract.

71. Plaintiff, as well as the Class, has at all times fulfilled its obligations, if any, under the Selling Agreement.

72. Ohio National is contractually required to pay commissions, including trail commissions, to Veritas after the termination of the Selling Agreement.

73. As noted above, Ohio National has clearly and unequivocally informed Plaintiff, as well as the Class, that it will not pay any commissions after the termination of the Selling Agreement.

74. Defendants' actions constitute a breach of the express terms of the contract and the duty of good faith and fair dealing implied in every contract.

75. As a direct and proximate result of Ohio National's breach and unlawful conduct, Veritas and the Class will be damaged, and Ohio National is therefore liable to Plaintiff in an amount to be determined by the Court, together with costs, interest and attorneys' fees as allowable by law. In addition, Plaintiff and the Class are entitled to specific enforcement of the terms of the Selling Agreement by way of declaratory judgment and injunctive relief.

## COUNT III
### Injunctive Relief

76. Plaintiff repeats, realleges and incorporates by reference the allegations contained in each and all of the preceding paragraphs as if fully stated herein.

77. Defendants have no right to harm the goodwill and reputation of Plaintiff and the Class through their interference with relationships created, maintained and developed by and at the expense of Plaintiff and the Class.

78. Unless Defendants are enjoined from the conduct described herein, Plaintiff and the Class will continue to suffer irreparable harm including loss of goodwill, loss of reputation, and financial losses that are presently not calculable.

79. Plaintiff and the Class have no adequate remedy at law.

80. The irreparable harm that Plaintiff and the Class will suffer if injunctive relief is denied outweighs the potential harm (if any) to Ohio National if injunctive relief is granted. Plaintiff and the Class have demonstrated a likelihood of success on the merits and that a balancing of the equities and the public interest favor the issuance of injunctive relief against Ohio National.

81. It is unjust and inequitable to permit Ohio National to benefit from the deliberate disregard of Ohio National's contractual and legal obligations.

82. The injunctive relief that Plaintiff requests would merely maintain the status quo requiring Ohio National to adhere to the Selling Agreement and its other legal obligations and is appropriate.

**COUNT IV**
**Tortious Interference with Contract**
**(Solely Against Defendant Ohio National Financial Services, Inc.)**

83. Plaintiff repeats, realleges and incorporates by reference the allegations contained in each and all of the preceding paragraphs as if fully stated herein.

84. Defendant Ohio National Financial Services, Inc., without a privilege to do so, induced or otherwise purposely caused the other Ohio National Defendants to breach their obligations under the Selling Agreement to Plaintiff and the Class.

85. Plaintiff and the Class will be damaged as a direct result of Ohio National Financial Services, Inc.'s interference with their contractual relationships with the other Ohio National Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that this Court:

1. That the Court determine, certify and order that the claims brought by the Class may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;
2. That the Court award money damages.
3. That the Court declare Plaintiff's and the Class' rights to trail commissions under the Selling Agreement.
4. That the Court award injunctive relief allowed for by law and equities.
5. That the Court award prejudgment and post-judgment interest.

6. That the Court award punitive damages and attorneys fees as may be permitted by law.

7. That the Court award such other relief as may be permitted by law and equity.

8. That the Court order Defendants to pay the costs of this action.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims.

Dated: November 8, 2018

Respectfully submitted,

VERITAS INDEPENDENT PARTNERS, LLC

By its attorneys,

**/s/ James B. Hadden**
James B. Hadden, Trial Attorney (0059315)
Geoffrey J. Moul (0070663)
Brian K. Murphy (0070654)
Joseph F. Murray (0063373)
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614.488.0400
Facsimile: 614.488.0401
Email: hadden@mmmb.com
       moul@mmmb.com
       murphy@mmmb.com
       murray@mmmb.com