**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

VERITAS INDEPENDENT PARTNERS, LLC,  :

              Plaintiff,                    :        **Case No. 1:18-cv-769**

v.                              :        **Judge Barrett**

THE OHIO NATIONAL LIFE
INSURANCE COMPANY, et al.,        :

              Defendants.               :

## <u>MOTION OF DEFENDANTS FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants The Ohio National Life Insurance Company ("ONLIC"), Ohio National Life Assurance Corporation ("ONLAC"), Ohio National Equities, Inc. ("ONEQ"), and Ohio National Financial Services, Inc. ("ONFS") (collectively, the "ON Defendants") move for summary judgment on all of named Plaintiff Veritas Independent Partners, LLC's ("Veritas") claims.  The basis for this Motion is set forth in the attached Memorandum in Support.

                                Respectfully submitted,

                                /s/ Marion H. Little, Jr.
                                Marion H. Little, Jr.   (0042679)
                                Trial Counsel
                                Christopher J. Hogan  (0079829)
                                ZEIGER, TIGGES & LITTLE LLP
                                3500 Huntington Center
                                41 South High Street
                                Columbus, Ohio  43215
                                (614) 365-9900
                                (Fax) (614) 365-7900
                                little@litohio.com
                                hogan@litohio.com

                                Attorneys for Defendants

<u>**MEMORANDUM IN SUPPORT**</u>

**I.**  <u>**INTRODUCTION**</u>

> "Trail commissions will continue to be paid to broker dealer of record [a] while the Selling Agreement remains in force <u>*and*</u> [b] will be paid on a particular contract [individual annuity] until the contract is surrendered or annuitized."
>
> [Exh. A-1 (Veritas Selling Agreement), at 14 (emphasis and brackets added).]

The singular issue presented by Veritas' Complaint is this:  Under the terms of a 2014 Selling Agreement (the "Selling Agreement") between ONLIC, ONLAC, ONEQ (the "ON Contracting Parties") and Veritas, were the ON Contracting Parties required to continue paying trail commissions to Veritas as to individual, variable annuity products—like the specific product identified in Veritas' complaint—following termination of the Selling Agreement?  As the above-quoted and dispositive contractual language makes clear, the answer is clearly <u>*no*</u>.

Such language unequivocally establishes that the termination of the Selling Agreement also terminated any obligation of the ON Contracting Parties to continue paying trail commissions as to individual variable annuity products.  The use of the conjunction "and" is critical, and plainly reflects that the subject trail commissions are <u>*only*</u> payable if <u>*both*</u> the Selling Agreement is in force <u>*and*</u> the pertinent annuity contract has not been surrendered or annuitized. In other words, both temporal clauses—that the Selling Agreement remain in force <u>*and*</u> that a particular annuity contract has not been surrendered or annuitized—impose <u>*joint*</u> conditions on the payment of trail commissions.

Hence, if a particular individual annuity contract has not been annuitized or surrendered, but the Selling Agreement is no longer in force, then <u>*no obligation to continue paying trail commissions exists*</u>.  Likewise, if a particular individual annuity contract has been surrendered or

1

annuitized, even though the Selling Agreement remains in force, no obligation to continue paying trail commissions exists.

That simply makes sense, and no other plausible interpretation, which gives effect to _all_ of the contractual language and the plain and ordinary meaning of the conjunction "and," exists. See, e.g., Mass. Mut. Life Ins. Co. v. Jefferson, 104 S.W.3d 13, 21 (Tenn. Ct. App. 2002) (describing "and" as a "coordinating conjunction" and citing Black's Law Dictionary as "defining 'and' as a 'conjunction connecting words or phrases expressing the idea that the latter _is to be added to or taken along with the first_'") (emphasis added).

Yet, as the basis for _each_ of its claims, Veritas proffers a contrary "interpretation." It asserts that, irrespective of their termination of the Selling Agreement, the ON Contracting Parties remain obligated to continue paying trail commissions as to individual variable annuity contracts (Veritas focuses on one specific type of such contracts) so long as those contracts have not been surrendered or annuitized. But, that interpretation would, if accepted, render meaningless the first clause preceding the "and" conjunction; i.e., that the Selling Agreement must remain "_in force_"—language that is _notably absent_ from _other_ contractual commission language relating to _other_ products (i.e., _group_ variable annuities) not at issue in Veritas' Complaint (and as to which the ON Contracting Parties have stated their intent to continue making payments, consistent with the contractual terms). It, therefore, runs headlong into well-established Ohio Supreme Court precedent.

Indeed, such an interpretation, "'is neither acceptable nor desirable under the normal rules of contract construction.'" State v. Bethel, 110 Ohio St. 3d 416, 424 (2006). To the contrary, where there is only one interpretation that gives effect to all contractual language, there is no ambiguity and the contract must be enforced so as to give effect to all of its terms. Id.

(finding contractual language plain and unambiguous because, "[g]iven the clear language [at issue], _and the need to ensure that the paragraph is not rendered meaningless_, the agreement before us is subject to only one reasonable interpretation.") (emphasis added).

The same is true here. The controlling language in the pertinent and controlling commission schedule to the Selling Agreement, quoted above, makes clear that the termination of the Selling Agreement is one of two events that terminates the ON Contracting Parties' obligation to continue paying trail commissions for individual variable annuities to Veritas. As a result, the ON Contracting Parties' decision to cease paying such commissions upon the effective date of the Selling Agreement's termination was consistent with and specifically authorized by the Selling Agreement; and it was not a breach of the Selling Agreement for them to do so—_as a matter of law_.

Therefore, all of Veritas' claims—including its claim for tortious interference against ONFS (a non-party to the Selling Agreement)—necessarily fail because they are premised on the ON Contracting Parties' same alleged breach of the Selling Agreement. Veritas may wish that it had negotiated a different deal. But, it cannot manufacture a "breach" of contract based on a facially illogical and untenable interpretation of _the language to which it actually agreed_.

The instant Motion should be granted and Defendants should be awarded summary judgment in their favor on _all_ claims.[1]

---

[1] Even though Veritas purports to bring this case as a putative class action, the Court may properly consider and rule upon the instant Motion, prior to any proceedings relating to class certification. That is because "[i]t is reasonable for a district court to consider a motion for summary judgment before reaching a motion for class certification when resolution of the former is likely to prevent 'needless and costly further litigation.'" Candaay v. Kelley, 1994 U.S. App. LEXIS 29186, *24 (6th Cir. Oct. 14, 1994). This matter presents a quintessential case for "accelerated summary judgment procedure' to winnow out substantively deficient class actions, prior to class certification …." Thomas v. Moore USA, Inc., 194 F.R.D. 595, 603 (S.D. Ohio 1999).

## II.        PERTINENT UNDISPUTED FACTS

### A.        Overview Of The Parties And The Veritas Selling Agreement.

By way of background, Defendants ONLIC and ONLAC are insurance companies that, among other things, offer for sale various insurance-related products, including life insurance. [Exh. A, Declaration of Thomas DeGaetano ("DeGaetano Dec.").]  Previously, ONLIC also offered and sold individual variable annuities.  [Id. ¶ 3.]  Variable annuities are annuities that include assets maintained in securities sub-accounts.  [Id.]

In order to make their products available to a wide customer base, ONLIC and ONLAC, along with ONEQ, have historically entered into "selling agreements" with third-party broker-dealers unaffiliated with Defendants—including Veritas.  [Id. ¶ 4.]  Such agreements authorized the contracting broker-dealers, including Veritas, to offer and sell various products created by ONLIC and ONLAC, including individual variable annuities. [Id.]

At issue in this case is a specific Selling Agreement dated August 25, 2014, and executed by Veritas and the ON Contracting Defendants.  [Exh. A-1 (the "Selling Agreement"); Compl. ¶ 12.]  By its express terms and through various addenda and supplements thereto, the Selling Agreement authorized Veritas (through its registered representatives) to sell various products, including individual variable annuities, such as ONLIC's ONcore variable annuities with an optional Guaranteed Minimum Income Benefit Rider (the "GMIB Annuities")—the specific product at issue in Veritas' Complaint.  [DeGaetano Dec.; Selling Agreement 13-17; Compl. ¶¶ 14-16, 28-30.][2]

---

[2]        ONEQ—a broker-dealer registered with the Financial Industry Regulatory Authority—was made a party to the Selling Agreement for regulatory reasons.  [DeGaetano Dec. ¶ 6.]  That is because the Selling Agreement authorized the sale of variable products, which are regulated as securities.  [Id.]  However, the individual annuities at issue were sold _by ONLIC_.  [Id.] The premiums paid for purchase of such annuities went _to ONLIC_. [Id.]  And, commissions owed to broker-dealers based on such annuities, pursuant to the terms of the Selling Agreements, were paid _by ONLIC_.  [Id.]

In addition and as discussed further below, the Selling Agreement included and expressly incorporated multiple Schedules of Commissions that, among other things, reflected the amounts and manner of commission payments that would be paid directly to Veritas for its sale of various Ohio National products. [Selling Agreement, at 2 § 9.][3] Those schedules included an "ONcore Commission Schedule," which specifically applied to and covered the sale of the GMIB Annuities at issue via Veritas' Complaint. Based on the ONcore Commission Schedule, one commission option provided to Veritas for GMIB Annuities was the payment of so-called "trail" commissions. [Selling Agreement, at 13-17.]

**B.      The ON Contracting Parties' Termination Of The Selling Agreement, Consistent With The Agreement's Terms.**

The Selling Agreement contained a specific provision governing the termination thereof. It stated, in full:

> This Agreement may be terminated *at the option of any party upon sixty (60) days written notice to the other parties*, or without notice at the option of any party hereto upon a material breach by any part of the covenants and terms of this Agreement.
>
> [Selling Agreement, at 3-4 § 20 (emphasis added).]

Thus, all parties to the Agreement were empowered to terminate the Selling Agreement, even in the absence of a material breach, by merely giving 60-days' advance written notice thereof to the other parties.

Here, the ON Contracting Parties exercised their right to do so by providing a notice of termination, dated September 21, 2018, to Veritas at the address listed in the Selling Agreement. [Exh. A-2 (9/21/18 Termination Letter); Selling Agreement, at 4 § 21.] Via that letter, the ON

---

[3]      Notably, Veritas only attached certain, selective supplements/addenda to the Selling Agreement as exhibits to its Complaint. A copy of the Selling Agreement, including all pertinent supplements and addenda (with Bates numbers added for ease of review), is attached to this Motion as Exhibit A-1. All page number references to the Selling Agreement, unless otherwise noted, refer to the added Bates numbers.

Contracting Parties expressly notified Veritas that they were terminating the Selling Agreement effective December 12, 2018—well over 60 days after such notice was provided. [Exh. A-2.]

Via the Termination Letter, the ON Contracting Parties further advised Veritas that upon termination of the Selling Agreement, the payment of individual annuity trail commissions (including GMIB Annuities) would cease; but the payment of, *inter alia*, group variable annuity trail compensation would continue, subject to the terms of the Selling Agreement. [Id.] This difference, as discussed below, is because of the different language contained in the commission supplements for those respective products.

Also on September 21, 2018, and without any contractual obligation to do so, the ON Contracting Parties—via a separate letter—offered to allow Veritas continued access to the customer information and the ability to service customers. [Exh. A-3.] As stated in that letter, as long as Veritas complied with the law and regulations as they relate to insurance and broker-dealer obligations, and complied with privacy regulations, the ON Contracting Parties would agree, among other things, to continue to provide Veritas with customer information and allow its registered representatives to continue to service the customers' contracts. [Id.]

Based on the ON Contracting Parties' provision of proper notice of termination, and consistent with the above-quoted contractual language, the Selling Agreement was, therefore, terminated effective as of December 12, 2018.

>    **C.    The Controlling Commission Payment Language Is Contained In The Pertinent Commission Supplements To The Selling Agreements—Language That Is Different As To Different Products.**

As it relates to the payment of commissions (and, specifically, trail commissions), both before and after termination of the Selling Agreement, the pertinent and controlling language is

found in the commission supplements to the Selling Agreement. This is made clear in Section 9 of the Selling Agreement, which states that:

> Commissions payable in connection with the Contracts [sold by Veritas] shall be paid to BD [Veritas], or its affiliated insurance agency, *according to the Commissions Schedule(s) relating to this Agreement* as they may be amended from time to time and in effect at the time the Contract Payments are received by ONL. ONL reserves the right to revise the Commission Schedules at any time upon at least thirty (30) days prior written notice to BD. ONL also reserves the right to adjust the compensation payable on sales of ONL products that replace existing ONL contracts and offset future compensation payable to BD against any compensation to be returned to ONL by BD. Compensation to the BD's Representatives for Contracts solicited by the Representatives for Contracts solicited by the Representatives and issued by ONL will be governed by an agreement between BD and its Representatives and its payment will be the BD's responsibility. In those states where express assignment of commissions is required, BD hereby assigns its Representatives' commissions to its affiliated insurance agency for those states.
>
> BD will not pay any compensation to a Representative licensed pursuant to this Agreement until such Representative is authorized to receive such compensation under applicable state law.
>
> The terms of compensation shall survive this Agreement unless the Agreement is terminated for cause by ONL, provided that BD remains a broker-dealer in good standing with FINRA and other state and federal regulatory agencies and that BD remains the broker-dealer of record for the account.

[Selling Agreement, at 2 § 9.]

To be sure, this clause provides for survival of the "*terms*" of compensation absent a "for-cause" termination of the Selling Agreement. [Id. (emphasis added).] But, the same provision also makes clear that such "terms" are supplied by *the pertinent commission supplements*. Thus, the pertinent commission supplements contain the controlling language for purposes of the Court's analysis of Veritas' claims.

1.     **The ONCore Commission Schedule Language Specifically Provides For Termination Of Trail Commission Payments Upon Termination Of The Selling Agreement.**

As to individual variable annuities generally, and as to the GMIB Annuities specifically at issue in this case, as Veritas readily admits, the controlling "terms" regarding payment of trail commissions are found in the ONcore Commission Schedule. [See Compl. ¶¶ 29-30.]  Indeed, Veritas attached a copy of such schedule as Exhibit B to its Complaint. [Compl. ¶¶ 24-30; Selling Agreement, at 13-17.]

Aside from describing certain chargebacks applicable upon the death of an annuitant and the method for calculating trails, the ONcore Commission Schedule specifically stated the following as to the payment of trail commissions for individual variable annuities (including the GMIB Annuities):

> Trail commissions *will continue to be paid to broker dealer of record while the Selling Agreement remains in force* **and** will be paid on a particular contract until the contract is surrendered or annuitized.

[Selling Agreement, at 14-17 (emphasis added).]

On its face, this language plainly indicates that trail commissions will be paid on particular individual variable annuity contracts that have not been surrendered or annuitized *so long as the Selling Agreement remains in force*.   A contrary interpretation that would mandate the payment of trail commissions as to in-force individual annuity contracts even after termination of the Selling Agreement would, quite simply, render the above-quoted and highlighted phrase superfluous, and therefore, a nullity.

      **2.**      **In Contrast To ONcore Commission Schedule Language, The "Group Variable" Annuity Commission Schedule To The Selling Agreement Contains Different Language That Makes Clear The Commission Payments As To Those Types Of Contracts May Continue Following Termination Of The Selling Agreement.**

In stark contrast to the ONcore Commission Schedule is the Group Variable Annuity Addendum and Commission Schedule, which was also incorporated as part of the Selling Agreement—although notably not included as part of the exhibits attached to Veritas' Complaint.  [Selling Agreement, at 20-22.]  As to that type of group product, the pertinent Commission Schedule states that:

> Trail Commissions are paid quarterly and are calculated on the average monthly contract balance during the quarter _as long as the Contract remains in effect and a duly appointed Representative of BD is servicing the contract to Ohio National's satisfaction_.

> [Id. at 22, n.3 (emphasis added).]

Tellingly, this provision says _nothing_ about the Selling Agreement remaining "in force." Rather, the _only_ limitations imposed upon the continued payment of trail commissions for Group Variable Annuities are:  (1) the continued effectiveness of the group annuity contract at issue; and (2) a duly appointed representative of Veritas continuing to satisfactorily service that contract.

Such language shows that the contracting parties, including Veritas, knew how to craft trail commission payment terms that were _not conditioned upon the Selling Agreement remaining "in force"_—terms the ON Contracting Parties _intend to honor_, as stated in their September 21, 2018 letter.  [Exh. A-2.]  The use of different language regarding the conditions for payment of individual variable annuity trails, including as to the at-issue GMIB Annuities, can, thus, only be viewed as a distinction with a clear (and intentional) difference.

**3.** **All Of Veritas' Claims Are Based On The Same Alleged Predicate: The ON Contracting Parties' "Breach" Of The Selling Agreement By Terminating The Payment Of Trail Commissions For GMIB Annuities Upon Termination Of The Selling Agreement.**

Against this backdrop, Veritas asserts several "claims" against Defendants. But, each claim is specifically premised on the same alleged predicate: that the ON Contracting Defendants are contractually obligated to continue paying trail commissions for individual variable annuities (specifically, GMIB Annuities) following termination of the Selling Agreement. Thus, a ruling that the ON Contracting Parties have not breached the Selling Agreement would be dispositive of _all_ claims.

For example, in Count I, Veritas merely seeks declaratory relief that Defendants are obligated to continue paying trail commissions on all "Contracts"—defined as GMIB Annuities—until they are surrendered or annuitized, even when the Selling Agreement is not in force. [Compl. ¶¶ 14, 67-68.] In Count II, Veritas accuses the ON Contracting Parties of breaching the Selling Agreement by refusing to pay trail commissions on GMIB annuities after their termination of the Selling Agreement became effective. [Id. ¶¶ 72-75.]

In Count IV, Veritas asserts a tortious interference claim against ONFS, as the parent company of ONLIC. [Id. ¶ 8.] However, the basis for such claim, as framed by Veritas, is limited to its allegation that ONFS "caused the other Ohio National Defendants to breach their obligations _under the Selling Agreement to Veritas_ ...." [Id. ¶ 84 (emphasis added).] Thus, if the ON Contracting Parties did not breach the Selling Agreement, then Count IV necessarily fails.

Finally, in Count III, Veritas asserts a separate claim or cause of action labeled "Injunctive Relief." But, injunctive relief is a remedy; not a claim. See AFS Logistics, L.L.C. v. Cochran, 2017 U.S. Dist. LEXIS 119798, *23-24 (M.D. Tenn., July 31, 2017) ("It is unclear why

Plaintiff has listed 'Injunctive Relief' as a count in the amended complaint, as injunctive relief is, as the term suggests, a remedy and not a cause of action. …  Count VII must be dismissed because a form of relief cannot state a cause of action upon which relief may be granted").[4]  The availability of such relief hinges on a viable, underlying cause of action.  Id.  But, here, since all of Veritas claims' are premised on an alleged breach of the Selling Agreement by the ON Contracting Parties, the absence of such a breach necessarily precludes the issuance of injunctive relief.

**III.**                         <u>**LAW AND ARGUMENT**</u>

As made clear above, the controlling "terms" of compensation, and specifically the payment of trail commissions, applicable to individual variable annuities including the GMIB Annuities, are set forth in the ONcore Commission Schedule.  To reiterate, those terms are: "Trail commissions *will continue to be paid to broker dealer of record* [a] *while the Selling Agreement remains in force **and*** [b] will be paid on a particular contract until the contract is surrendered or annuitized."  [Selling Agreement, at 14-17 (emphasis and brackets added).]  The Court's role is, thus, to determine whether or not these terms required the ON Contracting Parties to continue paying trail commissions on individual variable annuities, such as the GMIB Annuities, to Veritas following the termination of the Selling Agreement.  The answer is clearly no.

In making this determination, the Court should be guided by several, well-settled principles of contract law.  *First*, the interpretation of a written contract is a matter of law for the Court to decide, and the Court is charged with applying the plain and unambiguous language of

---

[4]    Citing <u>Cronin v. Bank of Am.</u>, 2013 WL 2626739, *6 (E.D. Mich. June 11, 2013) ("In Count III, [plaintiff] requests injunctive relief. This claim must be dismissed because injunctive relief is a remedy, not a cause of action."); <u>Tann v. Chase Home Fin., L.L.C.</u>, 2011 WL 3799841, *10 (E.D. Mich. Aug. 26, 2011) ("[P]laintiff cannot seek an injunction as a stand-alone cause of action; it is only available as an equitable remedy.").

the contract. <u>Alexander v. Buckeye Pipeline Co.</u>, 53 Ohio St. 2d 241, Syll. ¶ 1 (1978) (superseded by statute on other grounds).[5]

<u>Second</u>, the intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement—language which must be applied and enforced "according to its plain, ordinary, and common meaning." <u>Schaeffer v. First Merit Bank, N.A.</u>, 186 Ohio App. 3d 173, 180 (9th Dist. 2009). "Where the contractual terms are unambiguous, a court cannot create a new contract by finding an intent not expressed in the clear language of the contract." <u>Time Warner Entm't Co., LP v. Kleese-Beshara-Kleese</u>, 2009 Ohio App. LEXIS 5626, *9 (Ohio App. 11th Dist., Dec. 18, 2009).

As this Court, itself, has aptly summarized:

> Construction of a written contract is a matter of law to be determined by the court. As a general rule, contracts should be construed so as to give effect to the intention of the parties. In construing a contract, *a court must give meaning to every paragraph, clause, phrase, and word, omitting nothing as meaningless, or surplusage* and must consider the subject matter, nature, and purpose of the agreement.
>
> [<u>Walmed Pharm., Ltd., LLC v. Hi-Tech Pharmacal Co.</u>, 2010 U.S. Dist. LEXIS 40598, *8 (S.D. Ohio Apr. 26, 2010 (Barrett, J.) (emphasis added).]

Consistent with these basic principles, and for multiple reasons, the plain and unambiguous language of the ONcore Commission Schedule makes clear that the ON Contracting Parties' obligation to pay trail commissions on individual variable annuities, including the GMIB Annuities, *ended with the termination of the Selling Agreement*. Thus, as a matter of law, the ON Contracting Parties did not breach the Selling Agreement by discontinuing

---

[5] The Selling Agreement specifically states that it shall be "construed in accordance with the laws of Ohio." [Selling Agreement, at 4 § 22.] Veritas does not dispute that Ohio law applies. Rather, it specifically cited this choice of law in its Complaint. [Compl. ¶ 13.]

such payments upon the effective date of the agreement's termination, and all of Veritas' claims necessarily fail.

> A. **Use Of The Conjunction "And" Makes Clear That Two Conditions Must Be Satisfied For Payment Of Trail Commissions Under The ONcore Commission Schedule: The Selling Agreement Must Be In Force And The Particular Annuity At Issue Must Not Have Been Surrendered Or Annuitized.**

On its face, the above-quoted ONcore Commission Schedule trail commission payment provision contains two temporal clauses joined by the conjunction "and": (1) the Selling Agreement must be in force _and_ (2) the particular annuity contract at issue must not have been surrendered or annuitized. That means for such commissions to be payable, the Selling Agreement must first be in force. See Corporate Fin., Inc. v. Principal Life Ins. Co., 461 F. Supp. 2d 1274, 1286 (S.D. Fla. 2006) (holding that provision stating that commissions will be paid "while this agreement is in force" means that "the obligation to pay commissions … ceases when the agreement terminated"). But, even if the Selling Agreement is in force, trail commissions are payable only if the particular annuity or "contract" at issue has not been annuitized or surrendered. Hence, if _either_ one of these conditions is not satisfied, then _no trail commissions are payable_.

This plain reading is confirmed by case law recognizing the ordinary usage and meaning of the conjunction "and." For example, in Cargill Meat Sols. Corp. v. Premium Beef Feeders, LLC, 168 F. Supp. 3d 1334, 1343 (D. Kan. 2016), the court held that the following contractual provision obligated Cargill to both determine _and_ implement risk management strategies: "The Parties agree that Cargill will be solely responsible for determining _and_ implementing any risk management (i.e. hedging) strategies for the Cattle on feed with the Feedlot Vendor, and the grain associated with feeding the Cattle." Id. (emphasis added).

In so holding, the court rejected Cargill's proffered construction that it would have been justified in not implementing any risk management strategies if it determined that none were required. Id. As the court noted, "[t]his reading ignores the word 'and.' Use of the word 'and' is significant. Cargill's interpretation makes the implementation of risk management strategies dependent on a prior determination. But 'and' does not denote dependence. Rather, it is a coordinating conjunction used to link independent ideas. In this context, Cargill had a responsibility *both to determine and implement any risk management strategies*." Id.

So, too, in Vannatta v. Vannatta, 2012 Va. App. LEXIS 366, at *16 (Va. Ct. App., Nov. 20, 2012), the court recognized that the use of the "coordinating" conjunction "and" in a contractual provision "signifies that the words [before and after] are of equal rank *and should be read together*." And, in Mass. Mut. Life Ins. Co. v. Jefferson, 104 S.W.3d 13, 21 (Tenn. Ct. App. 2002), the court looked to Black's Law Dictionary in defining "and" as a "conjunction connecting words or phrases expressing the idea that the latter is to *be added to or taken along with the first*."

So, too, here. The use of the coordinating conjunction "and" in the ONcore Commission Schedule plainly denotes that the clauses preceding and succeeding the term express *joint* conditions that *must both exist* in order for trail commissions to be payable. As a result, *either* the termination of the Selling Agreement, as occurred here, or the surrender or annuitization of a particular GMIB (or other individual variable) Annuity was sufficient to relieve the ON Contracting Parties of any obligation to continue paying trail commissions. Accordingly, the ON Contracting Parties did not breach the Selling Agreement.

**B.** **The Use Of Different Language In A Different Supplement For A Different, Group Product Available To Be Sold Per The Selling Agreement Further Demonstrates That The Inclusion Of The "In Force" Requirement In The ONcore Commission Supplement Was Intentional**.

This conclusion is confirmed by the existence of trail commission payment language in the _Group_ Variable Annuity Addendum and Commission Schedule that makes clear the continued effectiveness of the Selling Agreement is not a condition to the payment of trail commissions for that product. The existence of such language in one portion of the parties' contract demonstrates that they knew how to craft language that would provide for the payment of trail commissions after termination of the Selling Agreement. The fact that they _did not use such language (and, instead, used different language) in the ONcore Commission Supplement_, thus, must have been intentional and reinforces the plain meaning of the language used in that supplement, as discussed above.

Ohio case law makes this clear. On point is <u>Nour v. Shawar</u>, 2014 Ohio App. LEXIS 2951, *4-11 (10th Dist., July 8, 2014). There, the court held that the contracting parties' inclusion of an express reference to attorneys' fees in one indemnification provision, coupled with the exclusion of such a reference in another indemnification provision, reflected their clear intent that no fee award was available under the latter provision. In so holding, the court applied the basic rule of _expressio unius est exclusion alterius_ in recognizing that:

> A rule of construction appears applicable: "expressio unius est exclusio alterius, or the expression of one thing implies the exclusion of another thing ..." ... "[One section] demonstrates that the drafters of this contract knew how to include language that would include attorney fees within 'Claims' subject to indemnification with respect to the seller. _The absence of such language in a parallel provision relating to purchaser indemnification exhibits an intention that a reciprocal obligation does not exist_. ...
>
> The parties in this case knew how to draft an indemnification

15

provision that included recovery of "reasonable counsel fees." The parties expressly provided that Shawar could recover such fees from Nour when they added a second sentence to section 11.1. Under Continental Tire, *the omission from Section 11.2 of the second sentence regarding counsel fees must mean that Nour is not entitled to indemnification for such fees*. When we consider the two indemnification provisions in the sublease together, the only reasonable interpretation of Section 11.2 is that Nour does not have the right of indemnity for "reasonable counsel fees." Had the parties so intended, they would have added a second sentence to Section 11.2.

Nour asks this court to interpret the language of Section 11.2 in isolation and to determine the scope of his right to indemnification without reference to the corresponding indemnity provision in Section 11.1. However, this court has emphatically stated that "contracts must be read as a whole, and individual provisions must not be read in isolation." ... If the parties intended the phrase "all claims, expenses, liabilities, and causes of action arising from ... (iv) the breach by Shiwar" to include indemnity for "counsel fees," as Nour contends, *then there would have been no reason for the parties to add a second sentence to Section 11.1*. In other words, if we adopt Nour's construction of Section 11.2, the second sentence of Section 11.1 is meaningless. ... The only reasonable construction of the sublease that gives meaning to the second sentence of Section 11.1 is a construction that precludes indemnification for Nour's attorney fees. …

[Id. (emphasis added).]

In a similar context, the court in Cont'l Tire N. Am. v. Titan Tire Corp., 2010 Ohio App. LEXIS 1138, *24-27 (6th Dist., March 31, 2010), held that the inclusion of certain language in one clause meant that its exclusion from another, similar clause must have been intentional. Specifically, in language quoted in Nour, *supra*, it recognized that one section "demonstrates that the drafters of this contract knew how to include language that would include attorney fees within 'Claims' subject to indemnification with respect to the seller. The absence of such language in a parallel provision … exhibits an intention that a reciprocal obligation does not exist." Id.

16

The same is true here.  The Group Variable Annuity Addendum and Commission Schedule to the Selling Agreement makes clear that the contracting parties knew how to craft language that *does not condition* the payment of trail commissions on the Selling Agreement remaining in force.  Thus, the use of specific language in the ONcore Commission Supplement referencing such a condition must have been intentional, and means that termination of the Selling Agreement also terminated the ON Contracting Parties' obligation to continue paying trail commissions on individual variable annuities, like the GMIB Annuities.  For this additional reason, no breach of the Selling Agreement exists, as a matter of law.

**C.     Veritas' Proffered Construction Would Render The First Clause Of The Controlling Provision In The ONcore Commission Schedule Meaningless— In Contravention Of Ohio Supreme Court Precedent.**

Veritas' proffered construction, on the other hand, would fail to give effect to *all* of the contractual language contained in the ONcore Commission Schedule. Veritas asserts that the above-quoted language means that the ON Contracting Parties are obligated to continue paying trail commissions on GMIB Annuities *even after termination of the Selling Agreement*, so long as the specific annuity contracts at issue have not been annuitized or surrendered.  [Compl. ¶ 30.]

But, if that is truly the case, then why was the first clause requiring that the Selling Agreement remain "in force" included?  Under Veritas' theory, the status of the Selling Agreement would be *wholly irrelevant* to the ON Contracting Parties' payment obligation; and the only pertinent consideration for payment of trail commissions on individual variable annuities (like the GMIB Annuities) would be whether the individual annuity contracts have been surrendered or annuitized.

Such a construction is plainly untenable and incorrect because it would render the "in force" clause preceding the "and" conjunction meaningless, and therefore, null.  The Ohio

Supreme Court has recognized that where there is only one interpretation of a contract that would give meaning to all of its terms, such meaning must be applied. See State v. Bethel, 110 Ohio St. 3d 416, 424 (2006) ("[A]n interpretation that would render a provision meaningless … 'is neither acceptable nor desirable under the normal rules of contract construction.'").

In Bethel, the Court—applying basic contract principles—rejected a party's contention that a plea agreement was ambiguous because that party's proffered construction of the purported ambiguity would have rendered certain contract terms meaningless. In so holding, the Court noted that:

> [T]here is no ambiguity in the agreement before us. An agreement is ambiguous if it is "subject to more than one reasonable interpretation." *Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc.* (1990), 52 Ohio St.3d 174, 177, 556 N.E.2d 1186. ... Given the clear language of Paragraph One, *and the need to ensure that the paragraph is not rendered meaningless*, the agreement before us is subject to only one reasonable interpretation. The breach by Bethel voided the plea agreement and returned the parties to their previous position as stated in Paragraph Six, except that Bethel's proffer could then be used against him, as plainly provided by Paragraph One. *This construction addresses the entire agreement and avoids the incorrect result of rendering Paragraph One meaningless*.

[Id. (emphasis added).][6]

Veritas' proffered construction here runs headlong into this *controlling* precedent and would render half of the ONcore Commission Supplement trail commission payment provision meaningless. Such a contention is, quite simply, legally wrong and should be rejected as a matter of law. The only reasonable interpretation that gives effect to *all* of the language contained in such provision is the same one that is apparent and obvious from the face of the language used: the termination of the Selling Agreement also terminated the ON Contracting

---

[6]     Accord: Packer, Thomas & Co. v. Eyster, 126 Ohio App. 3d 109, 115 (7th Dist. 1998) ("[C]ontracts must be read as a whole and interpreted so as to give effect to every provision.").

Parties' obligation to continue paying trail commissions for individual variable annuities to Veritas.

**IV.**                                          **CONCLUSION**

In sum, the pertinent and controlling contractual language makes clear that the ON Contracting Parties were relieved of any obligation to continue paying trail commissions to Veritas on individual variable annuities (including GMIB Annuities) after the termination of the Selling Agreement. Thus, as a matter of law, the ON Contracting Parties did not breach the Selling Agreement when they ceased making such payments upon the effective date of the Selling Agreement's termination.

Since all of Veritas' claims are premised on the existence of such a breach, they necessarily fail. Defendants are entitled to summary judgment on all claims in the Complaint, and the instant Motion should be granted.

Respectfully submitted,

/s/ Marion H. Little, Jr.
Marion H. Little, Jr.   (0042679)
Trial Counsel
Christopher J. Hogan   (0079829)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio  43215
(614) 365-9900
(Fax) (614) 365-7900
little@litohio.com
hogan@litohio.com

Attorneys for Defendants
The Ohio National Life Insurance Company,
Ohio National Life Assurance Corporation,
Ohio National Equities, Inc., and Ohio
National Financial Services, Inc.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 22, 2019, a copy of the foregoing was filed electronically with the Clerk of this Court using the CM/ECF system, which will send notification of such filing to all counsel of record to this action

/s/ Marion H. Little, Jr.
Marion H. Little, Jr.    (0042679)

414-033:794222