# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

**VERITAS INDEPENDENT
PARTNERS LLC, et al.,**[1]

      **Plaintiffs,**            Case No. 1:18-cv-769
                                             JUDGE DOUGLAS R. COLE

   v.

**THE OHIO NATIONAL LIFE
INSURANCE COMPANY, et al.,**

      **Defendants.**

## OPINION AND ORDER

This cause comes before the Court on the Motion for Judgment on the Pleadings (Doc. 69) submitted by just *one* of the Ohio National Defendants[2]—Ohio National Financial Services, Inc. ("Ohio Financial"). For the reasons below, the Court **DENIES** Ohio Financial's Motion.

## BACKGROUND

Ohio National is an insurance company that issues various insurance-related products. Among those products are individual variable annuities, including the kind at issue here—Guaranteed Minimum Income Benefits ("GMIB") Contracts. As the

---

[1] The Plaintiffs in this action, so far, are Veritas Independent Partners LLC and Avantax Investment Securities, Inc. (collectively, "Veritas"). The Court says they are the Plaintiffs "so far," because they allege they also are bringing this lawsuit on behalf of similarly situated broker-dealers, though they have not yet sought class certification.

[2] The Court refers to the Defendants collectively in this Opinion as "Ohio National." The Defendants are The Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, Ohio National Equities, Inc., and Ohio National Financial Services, Inc. While there are four Defendants, the Motion (Doc. 69) at issue in this Opinion & Order was filed by just one of these Defendants: Ohio National Financial Services, Inc. ("Ohio Financial").

1

name suggests, these annuities provide a guaranteed income to the purchaser regardless of the performance of the underlying investment. That may be a good deal for the purchaser, but at some point, Ohio National allegedly concluded that these annuities weren't so good (i.e., profitable) for Ohio National. So, according to Veritas, Ohio National devised a scheme to exit as many of these annuities as it could.

The scheme allegedly went as follows: Ohio National terminated its selling agreements with broker-dealers—like Veritas—who were responsible for selling the annuities to individual investors. Ohio National then claimed that this termination meant it no longer needed to pay trail commissions on those annuities to the broker-dealers, and Ohio National told the broker dealers as much in letters it sent them. (Trail commissions are commissions that Ohio National would pay on a periodic basis to the broker-dealer of record based on the value of the annuity while the annuity was in effect. These commissions would compensate the broker-dealers for the ongoing costs associated with servicing the annuities.) According to Veritas, Ohio National's decision to terminate the selling agreements and to cease paying trail commissions was meant to pressure broker-dealers to encourage their clients to relinquish their GMIB Contracts, thereby alleviating the ongoing losses these GMIB Contracts allegedly were causing Ohio National.

None of this sat well with Veritas. It responded by filing this class-action lawsuit on behalf of itself and similarly situated broker-dealers. In so doing, Veritas became one of the many broker-dealers who have enmeshed Ohio National in federal litigation across the country over its decision to stop paying trail commissions on

certain annuities. *See, e.g.*, *Ohio Nat'l Life Ins. Co. v. Cetera Advisor Networks, LLC*, No. 1:19-cv-47, 2021 WL 2819838 (S.D. Ohio July 7, 2021); *Next Fin. Grp. v. Ohio Nat'l Life Ins. Co.*, No. 4:18-cv-4652, 2019 WL 4739508 (S.D. Tex. Aug. 30, 2019); *Commonwealth Equity Servs., LLC v. Ohio Nat'l Life Ins. Co.*, No. 18-cv-12314-DJC, 2019 WL 1470131 (D. Mass. Apr. 3, 2019).

As in some of those other cases, Ohio National in this case has already attempted to persuade the Court that the contract unambiguously relieves Ohio National of any obligation to continue paying trail commissions when the selling agreement is no longer in force. And, as the courts in those other cases held, this Court decided (while the case was assigned to a different judge) that the selling agreement here does not unambiguously support Ohio National's position. The Court therefore denied Ohio National's Motion for Summary Judgment. (*See* Docs. 13 and 31).

The issue now before the Court is different. One (and only one) of the Defendants—Ohio Financial—moves for (partial) judgment on the pleadings with respect to Count III of Veritas's First Amended Class Action Complaint. That Count asserts a tortious-interference-with-contract claim under Ohio law against Ohio Financial. Veritas alleges that Ohio Financial "induced or otherwise purposely caused the other Ohio National Defendants to breach their obligations under the Selling Agreement to Plaintiff and the Class." (Am. Compl., Doc. 37, #466[3]).

---

[3] Refers to PageID#

3

Ohio Financial is the parent company of the other Ohio National Defendant companies. The latter are thus Ohio Financial's subsidiaries. That is important because, according to Ohio Financial, binding Sixth Circuit precedent (interpreting Ohio law) prohibits a claim of tortious interference based on a parent's alleged interference with a subsidiary's contract. *See Canderm Pharm., Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597 (6th Cir. 1988).

Veritas, for its part, points to an Ohio Court of Appeals decision, *Paramount Farms International, L.L.C. v. Ventilex, B.V.*, 61 N.E.3d 702 (Ohio Ct. App. 2016). According to Veritas, the *Paramount Farms* decision means that *Canderm* no longer binds this Court because "Ohio law has measurably changed" in the 30-plus years since the Sixth Circuit decided *Canderm*. (Resp. in Opp., Doc. 71, #2186).

Sorting out this disagreement is the task before the Court.

## LEGAL STANDARD

When a defendant moves for judgment on the pleadings (as Ohio Financial does here), the court must construe the complaint in the light most favorable to the plaintiff and accept the well-pleaded factual allegations as true. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). The court's task is thus much like reviewing a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

4

**LAW AND ANALYSIS**

At the center of this dispute is the Sixth Circuit's decision in *Canderm* and whether later Ohio case law has displaced it as the law that controls here. Before delving into that issue, however, the Court offers a word of caution.

Both sides treat the relevant portion of *Canderm* as holding instead of dictum. That may be a mistake. In that part of the decision, the Sixth Circuit was analyzing a district court's ruling that a tortious inference claim failed because it was based on a parent company's alleged interference with its subsidiary's contract, and the parent company (by virtue of being the parent company) was privileged to so interfere.

The Sixth Circuit noted its *likely* agreement with that conclusion, stating, "[i]t *would appear*, then, that the trial court was correct in its conclusion that SPI, the parent company of Elder, was, in effect, the same entity as Elder, and, so, was privileged to become involved in the relations between Canderm [the plaintiff] and Elder." *Canderm*, 862 F.2d at 601 (emphasis added). But the Sixth Circuit did not ultimately affirm the district court on that ground. It held, more narrowly, that "*even if* SPI was not privileged to become involved in the relations between Canderm and Elder … there simply [was] no cause of action in Ohio to sanction the actions Canderm alleges were performed by SPI." *Id.* at 601–02 (emphasis added). That was so because, according to the Sixth Circuit, "when only a breach of contract is alleged … 'the action sounds in contract, not tort in Ohio.'" *Id.* (It is worth noting that, here, Ohio Financial does not move for judgment on the pleadings based on this narrower ground. Perhaps that is because, unlike the plaintiff in *Canderm*, Veritas does not bring a breach-of-contract claim against the parent company.)

5

In any event, this distinction between holding and dictum ultimately makes no difference to the Court's analysis. Plenty of district courts have read *Canderm* as standing for the proposition that a parent company has essentially an absolute privilege to interfere with its subsidiary's contracts. *See, e.g.*, *Neely v. Crown Sols. Co., LLC*, No. 3:13-cv-00109, 2013 WL 6056205, at *16 (S.D. Ohio Nov. 15, 2013); *Kirk v. Shaw Env'tl., Inc.*, No. 1:09-cv-1405, 2010 WL 1387887, at *7 (N.D. Ohio Mar. 31, 2010); *Nephrology & Hypertension Specialists, LLC v. Fresenius Med. Care Holdings, Inc.*, No. 2:09-cv-781, 2010 WL 3069758, at *7 (S.D. Ohio Aug. 5, 2010).

And even if the parties had acknowledged that the relevant part of *Canderm* was dictum, the Court ordinarily still would be inclined to follow it. *Cf. Westport Ins. Corp. v. Coffman*, No. C2-05-1152, 2009 WL 243096, at *7 (S.D. Ohio Jan. 29, 2009) (noting that, although the Sixth Circuit's statement in an opinion was dictum, such dictum was nonetheless "persuasive and instructive" because it was "the only Sixth Circuit law on … point"). Perhaps most importantly, the parties *do not* make any arguments based on this distinction, so they have waived any such argument (at least for the sake of resolving the instant Motion).

With that caveat, the Court will treat *Canderm* the same way that the parties (and other district courts) have treated it: as *holding* that, under Ohio law, a parent company has an absolute privilege to interfere with a subsidiary's contract. The question then becomes whether the Court must follow that holding (assuming it is a holding) given that no subsequent Sixth Circuit en-banc or United States Supreme Court decisions have overruled *Canderm*.

6

Ohio Financial argues that the Court must follow *Canderm* for two reasons. Reason number one: *Canderm* is a published Sixth Circuit decision constituting that court's *Erie* prediction of how the Ohio Supreme Court would decide the issue. Reason number two: No intervening Ohio Supreme Court decision speaks *directly* to the issue.

According to Ohio Financial, under the Sixth Circuit's decision in *Rutherford v. Columbia Gas,* 575 F.3d 616 (6th Cir. 2009), the combination of these two points requires the Court to follow *Canderm*. Ohio Financial leans especially on this language from *Rutherford*:

> Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, *unless an intervening decision of the state's highest court has resolved the issue.*

*Id.* at 619 (emphasis added). Because no intervening Ohio Supreme Court decision has "resolved" whether a parent can ever be liable for tortiously interfering with a subsidiary's contract, Ohio Financial argues that *Canderm* controls.

The problem with Ohio Financial's reading of *Rutherford*, however, is that it is incomplete. In holding that it was bound by a prior published Sixth Circuit decision, the *Rutherford* court did not merely point to the lack of any "intervening decision of the state's highest court [that] has resolved the issue." *Id.* Instead, earlier in the decision, the *Rutherford* court used a slightly different formulation, stating that "a 'panel cannot' reconsider a prior published case that interpreted state law, '*absent an*

7

*indication by the [state] courts that they would have decided [the prior case] differently.*'" 575 F.3d at 619 (quoting *Blaine Constr. Corp. v. Ins. Co. of N. Am.*, 171 F.3d 343, 350 (6th Cir. 1999)) (emphasis added) (alterations original). Or, as the *Rutherford* Court also put it (in yet another part of the decision): a later Sixth Circuit panel is "bound by" an earlier published Sixth Circuit decision "unless Ohio law has measurably changed in the meantime." *Id.* (quoting *Big Lots Stores, Inc. v. Luv N' Care, Ltd.*, 302 F. Appx. 423, 427 (6th Cir. 2008)). And in applying those principles to the case before it, the *Rutherford* Court noted that Ohio law had not "measurably changed in the meantime," *id.*, "[a]s no Ohio court ha[d] … reached a contrary holding" or "ha[d] suggested" that the prior published Sixth Circuit decision had "misapplied Ohio law." *Id.*

While the inclusion of these differing formulations in a single case potentially creates some ambiguity, read together they seem to imply a rule something like the following: Where an Ohio court (and not necessarily the Ohio Supreme Court) has *either* (1) reached a holding contrary to that of an earlier Sixth Circuit decision; *or* (2) suggested that the Sixth Circuit decision "misapplied Ohio law,"—a later Sixth Circuit panel may disregard the earlier panel's interpretation of state law. And if that is the case, then it would seem that a district court likewise is able to ignore that interpretation. After all, a district court is in much "the same position" as a three-judge-circuit-court panel with respect to earlier circuit-court precedent. *United States v. Bishop*, 453 F.3d 30, 31 (1st Cir. 2006).

8

But the Court notes that it need not rely on what *Rutherford* arguably only implies about a later circuit panel (or district court) being allowed to ignore an earlier circuit panel's state-law interpretation based on an intervening state appellate court decision. That is because, after *Rutherford*, the Sixth Circuit *did* exactly that. *See Bennett v. MIS Corp.*, 607 F.3d 1076 (6th Cir. 2010).

In *Bennett*, an earlier Sixth Circuit panel, *Davis v. Venture One Constr., Inc.*, 568 F.3d 570 (6th Cir. 2009), had held that certain Michigan Supreme Court cases and their progeny were consistent with the notion that "contractual duties do not limit separately existing common law tort duties." *Bennett*, 607 F.3d at 1095 (quoting *Davis,* 568 F.3d at 574–76). The *Bennett* panel (i.e. the later panel) disagreed. Of course, its disagreement alone would have been insufficient to disregard the *Davis* panel's earlier decision. What gave *Bennett* license to depart from *Davis* was an intervening decision from the state intermediate court. *See Carrington v. Cadillac Asphalt, LLC*, No. 289075, 2010 WL 446096 (Mich. Ct. App. Feb. 9, 2010).

The *Carrington* Court had expressed its disapproval of *Davis*, stating that *Davis* was inconsistent with Michigan Supreme Court case law. In holding that *Carrington*, and not *Davis*, controlled its decision, the *Bennett* Court explained that a later Sixth Circuit panel "may reconsider a previous panel decision interpreting state law when the state courts have expressly indicated that they disagree with the previous panel decision and would have decided it differently." *Bennett*, 607 F.3d at 1096 (cleaned up) (quoting *Hampton v. United States*, 191 F.3d 695, 701 (6th Cir. 1999)). That was the case in *Bennett*, where *Carrington* "expressly indicated" that

9

*Davis* had "incorrectl[y]" interpreted Michigan Supreme Court case law. *Bennett*, 607 F.3d at 1095. And the *Bennett* court's own assessment of those Michigan Supreme Court cases led it to conclude that it was "very unlikely that the Michigan Supreme Court would disagree with *Carrington*'s pronouncement that the *Davis* Panel's reasoning [ran] contrary to Michigan law." *Id.* at 1096. Thus, "[b]ecause *Carrington* provide[d] the [*Bennett* Court] with a clear indication that *Davis* would have been decided differently in the Michigan courts," the *Bennett* Court held "there [was] sufficient evidence to allow [it] to disregard ... *Davis*." *Id.* (citing *Hampton*, 191 F.3d at 701 and *Rutherford*, 575 F.3d at 619); *see also Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 358 (6th Cir. 2018) (holding that a later Sixth Circuit panel could disregard an earlier Sixth Circuit panel's published decision where the intermediate Tennessee appellate courts had disagreed with the earlier Sixth Circuit decision).

*Bennett* dooms Ohio Financial's Motion. Here, as there, a state intermediate court of appeals decision has "expressly indicated" its disagreement with the earlier Sixth Circuit decision. 607 F.3d at 1095. More specifically, in *Paramount Farms*, the Twelfth District Court of Appeals—in the course of reversing a state trial court that had relied on *Canderm*—expressly stated that *Canderm* did not "settle the issue of whether, in Ohio, a parent company can interfere with a subsidiary's contract as a matter of law." *Paramount Farms*, 61 N.E.3d at 709.

The Twelfth District also explained *why* it disagreed with *Canderm*. To start, the Twelfth District stated that *Canderm* had supported its holding as to the contours of Ohio's tortious interference law by reference to inapposite case law. *Paramount*

10

*Farms*, 61 N.E.3d at 709. And what apposite case law the *Canderm* court *did* cite came from New York and not Ohio. *Id.* More fundamentally, *Canderm* was inconsistent with later Ohio Supreme Court case law that "adopt[ed] Section 767 of the Restatement [(Second) of Torts]." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 860 (Ohio 1999). Section 767 provides guidelines for "determining whether an actor's interference with a contract was improper or 'privileged.'" *Paramount Farms*, 61 N.E.3d at 710. Under those guidelines, a court should consider:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity ore remoteness of the actor's conduct to the interference, and (g) *the relations between the parties*.

*Id.* (quoting *Fred Siegel*, 707 N.E.2d at 853).

Notably, "the relations between the parties" is "but *one* of several factors contained in Section 767" that courts should look to in "determining whether an actor's interference with a contract was improper or 'privileged.'" *Id.* (emphasis added). And "[t]he parent company/subsidiary relationship falls within the ambit of the 'relations between the parties' factor of Section 767." *Id.* at 710–11. According to *Paramount Farms*, the comments to Section 767 make clear that all of the factors are important and "must be weighed against each other and balanced in arriving at a judgment." *Id.* at 710 (quoting RESTATEMENT (SECOND) OF TORTS ("Restatement") § 767, comment b.). "The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it." *Id.* (quoting Restatement at comment c.). The *Paramount Farms* Court

11

thus reversed the trial court, which, much like Ohio Financial does here, cited *Canderm* in concluding as a matter of law that a parent company cannot be liable for interfering with a subsidiary's contract.

The *Paramount Farms* Court's close reading of the Ohio Supreme Court's case law "provides persuasive evidence that the [Ohio] courts would have decided [*Canderm*] differently," so "we should accord [*Paramount Farms*] deference." *Bennett*, 607 F.3d at 1096. Indeed, if anything, *Paramount Farms* arguably deserves greater deference than did the state-intermediate-appellate-court decision (*Carrington*) at issue in *Bennett*. That is so for at least two reasons. *First*, unlike *Carrington*, *Paramount Farms* is a published decision. *Cf. Bennett*, 607 F.3d at 1096 (explaining why the court was deferring to *Carrington* "notwithstanding the fact" that it was unpublished). And, *second*, the earlier Sixth Circuit panel in *Bennett* had *already* interpreted the relevant state-supreme-court case law. The problem, at least in *Carrington*'s view, was that the earlier panel had *misinterpreted* that law. Here, however, the *Canderm* Court did not have a chance to misinterpret Ohio Supreme Court law on the issue of tortious interference in the parent-subsidiary context. That is because *Canderm* was decided roughly five years before the Ohio Supreme Court even recognized the tort of tortious interference, *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (adopting the definition from Section 766 of the Restatement.), and roughly nine years before the Ohio Supreme Court laid down guidelines for determining when an actor's interference is improper. *Fred Siegel*, 707 N.E.2d at 853 (again, borrowing from the Restatement—specifically, Section 767). It

12

would seem, then, that the earlier Sixth Circuit panel here (*Canderm*) was at a much greater disadvantage in attempting to predict Ohio law on this issue than was the earlier panel in *Bennett* (*Davis*) as to the issue there.

Finally, the Court's own assessment of the relevant Ohio Supreme Court case law leads it to "conclude that it is very unlikely that the [Ohio Supreme Court] would disagree with [*Paramount Farms*'s] pronouncement that the [*Canderm*] panel's reasoning runs contrary to [Ohio] law." *Bennett*, 607 F.3d at 1096. The Court agrees with *Paramount Farms* that the relationship between the Defendants here, including the parent-subsidiary relationship, is but one of many factors the Court would need to consider under Ohio law before determining whether an actor's interference was improper or justified.

That follows from the Court's reading of *Fred Siegel* and, in turn, Section 767 of the Restatement (including comments b and c). It also follows from the Court's review of other courts' decisions that, like the Ohio Supreme Court's cases, have relied on Section 767 and, unlike the Ohio Supreme Court's cases, have directly addressed the parent-subsidiary issue. It is telling that those courts, citing Section 767, do not recognize an absolute privilege of a parent corporation to interfere with a subsidiary's contracts. They instead agree with *Paramount Farms* that the parent-subsidiary relationship is one of many other relevant factors to consider in determining whether such interference was proper. *See, e.g.*, *PSC Info Grp. v. Lason, Inc.*, 681 F. Supp. 2d 577, 595 (E.D. Pa. 2010) (noting that "[e]ven where a corporate parent has near-total control over a subsidiary, courts have declined to adopt a per se rule" permitting a

13

parent to interfere with a subsidiary's contracts) (citing *Nat'l Data Payment Sys. v. Meridian Bank*, 212 F.3d 849, 856 (3d Cir. 2000)); *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, No. 2018-0372-JTL, 2019 WL 4927053, at *76 (Ch. Oct. 7, 2019).

Thus, this Court, like those courts, would need to consider all of the Section 767 factors in determining whether Ohio Financial improperly interfered with the other Ohio National Defendants' contracts—factors that Ohio Financial has ignored in its Motion for Judgment on the Pleadings (Doc. 69).

## CONCLUSION

For these reasons, the Court **DENIES** Ohio Financial's Motion for Judgment on the Pleadings (Doc. 69).

**SO ORDERED.**

July 20, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**