IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| VERITAS INDEPENDENT PARTNERS, LLC, *et al.*, | : :  :  Case No. 1:18-cv-769 |
| *Plaintiffs*, | : : Judge Jeffery P. Hopkins |
| vs. | : : |
| THE OHIO NATIONAL LIFE INSURANCE COMPANY, *et al.*, | : : : |
| *Defendants*. | : |

**OPINION & ORDER**

Independent broker dealers, Veritas Independent Partners, LLC ("Veritas") and Avantax Investment Services, Inc. ("Avantax") (collectively, "Plaintiffs"), entered Selling Agreements with Ohio National that related to the sale of variable annuities.[1] [2] Under the terms, Plaintiffs would receive trail commissions—a form of compensation paid on a periodic basis based on the value of the annuity—in exchange for the sale of annuities to Plaintiffs' customers. Ohio National elected to terminate the Selling Agreements in 2018. This dispute centers on whether Ohio National must pay annuity trail commissions after not-for-cause termination of the Selling Agreements.

---

[1] Plaintiffs entered into the Selling Agreements with Defendants The Ohio National Life Insurance Company ("ONLIC"), Ohio National Life Assurance Corporation ("ONLAC") and Ohio National Equities, Inc. ("ONEQ"). Defendant Ohio National Financial Services, Inc. ("ONFS") was not a party to either Selling Agreement, but Plaintiff alleges that ONFS induced or purposely caused ONLIC, ONLAC, and ONEQ to breach their obligations under the agreements held with Plaintiffs. Am. Compl., Doc. 39, ¶¶ 74–76. For purposes of this Opinion, the Court will refer to all defendants collectively as "Ohio National."

[2] Veritas Independent Partners, LLC initiated this action. Upon agreement of the parties and the Court, *see* Doc. 36, Avantax Investment Services, Inc. was named as a Plaintiff in the Amended Complaint (Doc. 39) because both Veritas and Avantax assert the same claims arising from the executions and terminations of substantially similar Selling Agreements with Ohio National.

Ohio National contends the Selling Agreements do not provide for annuity trail commissions after termination, and now seeks summary judgment on that basis. Not surprisingly, Plaintiffs strongly disagree. For the reasons below, Ohio National's Motion for Summary Judgment (the "Motion") (Doc. 88) must be **DENIED**.

I.  BACKGROUND

A. The Selling Agreements

Ohio National is an insurance company that issues various insurance-related products including, among others, individual variable annuities[3] such as "ONcore Variable Annuities." Doc. 88-1, ¶¶ 1, 10. Ohio National sells these annuities by entering selling agreements with independent broker-dealers—like Avantax and Veritas—who then sell annuities to customers. *Id.* ¶ 2; Am. Compl., Doc. 39, ¶¶ 15–17. In exchange, the broker-dealers receive commissions. Doc. 88-1, ¶ 7.

Avantax[4] and Veritas entered Selling Agreements with substantially similar terms. *See* Doc. 39-1, Doc. 39-2. Both agreements were governed by Ohio law and provided that Plaintiffs would receive trail commissions for ONcore Variable Annuities that Plaintiffs sold. Trail commissions (also referred to in the finance industry as "trails") are commissions that Ohio National pays on a periodic basis to broker-dealers based on the value of the annuity so long as the annuity stays in effect. The parties operated under the agreements until Ohio National separately notified Avantax and Veritas that Ohio National was terminating the

---

[3] An annuity is an investment option that provides a specified income payable to the consumer at stated intervals for a specified period. JAMES F. DALTON ET AL., INSURANCE PLANNING 345 (Money Education, 7th ed. 2020). Variable annuities are one of several types of annuities available to consumers. These "offer a variable rate of return based on the overall return of the investment options that are chosen." *Id.* at 355.

[4] Avantax is the successor to the Selling Agreement between Ohio National and H.D. Vest. Investment, Sec., Inc. Doc. 88-1, ¶ 3.

Selling Agreements, effective December 12, 2018.[5] Doc. 88-1, ¶ 18. Am. Compl., Doc. 39, ¶¶ 35–37. The parties do not disagree that the termination was without cause. Together with terminating the Selling Agreements, Ohio National informed Plaintiffs that all annuity trail commissions would cease at the time of termination. Doc. 88-1, ¶ 19; Am. Compl. Doc. 39, ¶¶ 35–37. Whether Ohio National has a continuing obligation to pay trail commissions to Avantax and Veritas beyond termination is the basis of the parties' dispute.

There are two provisions that appear to be critical to resolving this question. First, Section 9 of the Selling Agreement (the "Survival Provision"). The Survival Provision provides that trail commissions "shall be paid to [Avantax and Veritas], or [an] affiliated insurance agency, according to the Commission Schedule(s) relating to this Agreement as they may be amended from time to time and in effect at the time the Contract Payments are received by [Ohio National]." Doc. 39-1, PageID 553; Doc. 39-2, PageID 561. The Survival Provision also states that

> [t]he terms of compensation *shall survive this Agreement unless the Agreement is terminated for cause by ONL [Ohio National]*, provided that [Avantax and Veritas] remain[] [] broker-dealer[s] in good standing with the [NASD/FINRA] and other state and federal regulatory agencies and that BD [Avantax and Veritas] remain[] the broker-dealer[s] of record for the account[s].

*Id.* (emphasis added). The second provision (the "In Force Provision") is found in the Commission Schedule attached to the Selling Agreements. The In Force Provision provides:

> Trail Commissions will continue to be paid to broker dealer of record *while the Selling Agreement remains in force* and will be paid on a particular contract until the contract is surrendered or annuitized.

Doc. 39-3 (emphasis added).

---

[5] Plaintiffs represent that Ohio National sent substantially similar notices to at least two hundred and fifty other independent broker-dealers. *Id.* ¶ 38.

Ohio National now moves for summary judgment, asking the Court to adopt its interpretation of the Selling Agreements, which is that the In Force Provision controls and imposes a temporal limitation on when annuity trail commissions must be paid—*i.e.*, so long as the Selling Agreements remain "in force." Plaintiffs counter that annuity trail commissions survive termination—or that, at a minimum, the extrinsic evidence gives rise to a reasonable inference that trail commissions survive, so this issue is one for a jury to decide.

### B. This Case, the *Oppenheimer* Decision, and Others

This is not the first case, nor the first motion, of its kind. Similar disputes related to the Survival Provision and In Force Provision in the Selling Agreements have been brought in this District and others. Ohio National has already unsuccessfully moved for summary judgment in this case. Judge Susan J. Dlott, while assigned to this matter,[6] determined:

> Having considered the text of the Selling Agreement[s] and the parties' arguments, the Court concludes that Defendants have not established as a matter of law that their obligation to pay trail commissions to Veritas [and Avantax] ended [] when they terminated the Selling Agreement[s]. Section 9 in the Selling Agreement[s] and the 'trail commission clause' in the attached Commission Schedule are ambiguous and possibly contradictory on the issue of whether Defendants had to pay trail commissions after terminating the Selling Agreement[s] without cause. The Court cannot determine the intent of the parties as a matter of law based on the four corners of the contract. Extrinsic evidence might shed light on the intent of the parties, but the parties have not yet had the opportunity to conduct discovery.

Doc. 31, PageID 416–17.[7] And at least two other courts outside this District presented with the same question have reached the same conclusion at the summary judgment stage. *See Kestra Inv. Servs., LLC v. Ohio Nat'l Life Ins.*, No. A-19-cv-00687-JRN, 2019 WL 7759340, at

---

[6] The undersigned is the fourth judge assigned to this case. This case was originally assigned to the Hon. Michael R. Barrett before being transferred to the Hon. Susan J. Dlott. Doc. 24. This case was then transferred to the Hon. Douglas R. Cole before being reassigned to the undersigned. Docs. 34, 131.

[7] Avantax had yet to be named as a Plaintiff at the time of Judge Dlott's Opinion.

4

*2 (W.D. Tex. Nov. 19, 2019) (concluding that because "[r]easonable minds could interpret the contract in favor of either party," the contract was therefore ambiguous and summary judgment inappropriate); *Next Fin. Grp. v. Ohio Nat'l Life Ins.*, No. 4:18-cv-4652, 2019 WL 4739508, at *4 (S.D. Tex. Sept. 3, 2019), *amended report and recommendation adopted*, 2019 WL 4736929 (S.D. Tex. Sept. 26, 2019) ("When the Selling Agreement and attached Commissions Schedule are read together, the provisions relied upon by each side cannot be harmonized.").

Additionally, another judge in this District contemplated the same contractual terms at issue—albeit on consideration of cross motions for judgment on the pleadings rather than summary judgment—in *Ohio Nat'l Life Ins. v. Cetera Advisor Networks, LLC*, No. 1:19-cv-47, 2021 WL 2819838 (S.D. Ohio July 7, 2021) (Cole, J.) ("*Oppenheimer*").[8] Having weighed the proposed interpretations, which mirror those proffered by the parties here, the Court determined that neither party was entitled to judgment on the pleadings:

> Both sides have identified contractual language that supports their preferred—and yet diametrically opposed—interpretations. But precisely *because* they can do so, the Court cannot agree that the contract *unambiguously* supports either position. To have any hope of divining the parties' intentions in the face of conflicting contractual language, the Court would need to consider extrinsic evidence.

*Id.* at *3. The Court added:

> [A]ll the above just explains why the Court does not think that the contract *unambiguously* means what either party says it means. Both sides have identified some strong (and some not-so-strong) arguments in support of their respective positions. And that is probably about what one would expect when, as the

---

[8] Upon the appointment of the Hon. Jeffery P. Hopkins on December 16, 2022, the instant case and *Oppenheimer* were reassigned for all further proceedings from the Hon. Douglas R. Cole in an order signed by then Chief Judge Algenon L. Marbley on December 21, 2022. The instant motion was one among more than two hundred others pending in civil cases reassigned to the undersigned. Doc. 131. *Oppenheimer* has remained stayed pending resolution of the instant Motion, which was fully briefed as of June 14, 2024 (accounting for Plaintiffs' related Motion to Strike, or in the Alternative, to File a Sur-Reply (Doc. 154)).

5

> Court finds here, the contract is ambiguous on the point at issue. Thus, neither party is entitled to judgment as a matter of law.

*Id.* at *6. Ohio National contends that *Oppenheimer*, coupled with admissions made during Plaintiffs' 30(b)(6) depositions, entitles Ohio National to summary judgment.[9] So, against this backdrop, the Court will consider Ohio National's Motion.

## II. STANDARD OF REVIEW

The party seeking summary judgment always bears the initial burden to show the lack of genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But the non-moving party cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). In other words, the dispute must be "genuine" (*i.e.*, supported by evidence) and go to a "material fact" (*i.e.*, a fact that could matter to the outcome).

In sum, after reviewing the evidence relied upon by the movant, the Court must determine whether there is some "sufficient disagreement" that demands submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th

---

[9] Ohio National repeatedly states that the Court in *Oppenheimer* expressly rejected Plaintiffs' interpretation. This is not the case. The Court in *Oppenheimer* found that Plaintiffs' interpretation was "not *necessarily* correct." 2021 WL 2819838, at *4. Though this may express uncertainty about Plaintiffs' interpretation, such a statement does not equate to outright rejection. To be sure, the Court added that *both* parties identified some strong and not-so-strong arguments in support of their respective positions. *Id.* at *6.

6

Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

### III. LAW & ANALYSIS

#### A. The Selling Agreements are ambiguous on the point at issue.

To start, Ohio law governs here. And under Ohio law, contract interpretation, including a determination of whether a contract is ambiguous, is a legal question. *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Envision Waste Servs., LLC v. Cty. of Medina*, 2017-Ohio-351, ¶ 15 (9th Dist.)). "[I]f a contract's 'language is unclear, indefinite, and reasonably subject to dual interpretations or is of such doubtful meaning that reasonable minds could disagree as to its meaning,' then it is ambiguous as a matter of law." *Id.* (quoting *Cadle v. D'Amico*, 2016-Ohio-4747, ¶ 24 (7th Dist.)).

The Selling Agreements, as they relate to Ohio National's obligation to pay trail commissions beyond termination, are ambiguous. As explained above, it has already been established here that the contract in question is ambiguous. Doc. 31. The Court declines to revisit this conclusion, *see Gillig v. Advanced Cardiovascular Sys., Inc.*, 67 F.3d 586, 590 (6th Cir. 1995) ("[T]he pre-transfer rulings constitute the law of the case and should not be lightly disturbed."), which is in accord with the analysis of other courts to consider this contract. *See, e.g.*, *Oppenheimer*, 2021 WL 2819838, at *6; *Kestra Inv. Servs.*, 2019 WL 7759340, at *2; *Next Fin. Grp.*, 2019 WL 4739508, at *4, *report and recommendation adopted*, 2019 WL 4736929. Ohio National does not get another bite at the apple.[10]

---

[10] Ohio National newly raises in its reply "elementary" logic—*i.e.*, the contrapositive rule—relied on by Judge Cole in *Sec'y of Labor v. Macy's Inc.*, No. 1:17-cv-541, 2022 WL 407238 (S.D. Ohio Feb. 10, 2022), a decision that Judge Cole issued nearly seven months after issuing *Oppenheimer*. Doc. 153, PageID 6748. Ohio National asks this Court to rely on Judge Cole's rationale in *Macy's* as a supplement to his earlier opinion in *Oppenheimer*, to find that Ohio National had no obligation to pay trail commissions following termination of

7

Thus, the Court proceeds to consider whether Ohio National is entitled to summary judgment based on the extrinsic evidence the parties have offered.

### B. This Court may consider extrinsic evidence because the Selling Agreements are ambiguous.

"Resolving the meaning of ambiguous terms in a contract is a matter of factual determination for the fact-finder." *Tera LLC v. Rice Drilling D, LLC*, 2024-Ohio-1945, ¶ 19. As established under Ohio law, when a contract as written is unclear or ambiguous, the court may consider extrinsic information, *i.e.*, evidence outside the four corners of the contract, "in an effort to give effect to the parties' intentions." *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). It then follows: "[w]hen interpreting an ambiguous contract with extrinsic evidence, summary judgment is proper so long as the 'extrinsic evidence presented to the court supports only one of the conflicting interpretations.'" *United Rentals, Inc. v. Keizer*, 355 F.3d 399, 410 (6th Cir. 2004) (quoting *Gencorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999)); *see also Arlington Video Prods. v. Fifth Third Bancorp.*, 569 F. App'x 379, 386 (6th Cir. 2014) ("Contract language can be interpreted by the court on summary judgment if the contract's terms are clear and unambiguous or, if the contract language is ambiguous, the extrinsic evidence supports only one of the conflicting interpretations, notwithstanding the ambiguity."). If, however, extrinsic evidence supports more than one conflicting interpretation, and there remains a genuine issue of material fact, the parties' intent becomes a question of fact for a jury, and not a judge, to decide. *Royal Ins. of Am. v. Orient Overseas*

---

the Selling Agreements. *Id.* at PageID 6760. Such a request would not only require the Court to revisit Judge Cole's decision in *Oppenheimer* and speculate why the rationale that he applied in an unrelated case was not applied to, or even discussed in, *Oppenheimer*—but it would also require this Court to ignore the congruent conclusions of multiple other jurists, including Judge Cole, and consider anew whether the Selling Agreements are ambiguous. This the Court will not do.

*Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008). Even in this context, the fundamentals of summary judgment analysis remain the same: "[r]ather than weighing the evidence, a court [] must construe the evidence in favor of the nonmoving party, including when drawing inferences from facts or resolving factual ambiguities or inconsistencies." *Tera, LLC* at ¶ 19.

### i. Proper extrinsic evidence

Before weighing the extrinsic evidence at issue, the Court must first address the parties' arguments related to the types of extrinsic evidence that the Court may properly consider. Each party takes a divergent view about the scope of extrinsic evidence.

Extrinsic evidence exists in various forms. It "may include the circumstances surrounding the parties at the time they entered into the contract, the objectives they intended to accomplish, and any acts by the parties that demonstrate how they construed the ambiguous term." *Urban Assocs. v. Standex Elecs., Inc.*, 216 F. App'x 495, 506 (6th Cir. 2007) (citing *Blosser v. Carter*, 67 Ohio App. 3d 215, 219 (4th Dist. 1990)). Or extrinsic evidence may consist of "a contracting party's own statement about what he understood the disputed contract term to mean when he wrote, negotiated, or signed the contract." *Id.* Some courts have considered the parties' "course of dealing" when evidence of the parties' precontract negotiations has proven inconclusive, *Infinity Cap. LLC v. Francis David Corp.*, 851 F. App'x 579, 589 (6th Cir. 2021), while others have relied on "post-contract formation conduct." *William Powell Co. v. OneBeacon Ins.*, 2016-Ohio-8124, ¶ 33 (1st Dist.). *See also Acme Contr, Ltd. v. TolTest, Inc.*, 370 F. App'x 647, 652 (6th Cir. 2010) ("Proof of the parties' course of dealing may be used to explain or supplement the parties' written agreement.").

The pertinent language in the Selling Agreements derives from Ohio National's boilerplate selling agreement. Barefield Tr., Doc. 159-1, 117:6–118:20. This presents both a

9

challenge and an opportunity for using extrinsic evidence to interpret the contract. As to the challenge, Veritas and Avantax appear to have accepted the form Selling Agreements offered by Ohio National, so the specific terms at issue in the agreements were not borne out of mutual negotiation by the parties. Shannon Tr., Doc. 85, 68:18–69:19, 132:1–9; Runyon Tr., Doc. 84, 86:13–19. Precontract negotiations are therefore unlikely to shed meaningful light on the parties' understanding at the time of the contract's formation. *Infinity Cap.*, 851 F. App'x at 589.

As to the opportunity, because Ohio National entered into substantially similar agreements with other broker-dealers, Plaintiffs have proffered evidence related to Ohio National's interpretation of these contract terms from its dealings with those broker-dealers. Ohio National argues that this type of evidence is impermissible, and much ink has been spilt by the parties on this point. This issue has prompted sincere and lengthy deliberation by the Court given the procedural posture, complexities, and interwoven nature of the evidence. The Court ultimately concludes that much of this evidence is permissible extrinsic evidence.

At least one Ohio court has observed that extraneous dealings with unrelated third parties are generally irrelevant to determining the intent of the parties to the contract at issue. *Ltd. Inv. Grp. Corp. v. Huntington Nat'l Bank*, 2022-Ohio-3657, ¶ 39 (10th Dist.). Here, however the third-party broker-dealers are anything but unrelated. These broker-dealers entered into selling agreements that contained provisions substantially similar to the Survival Provision and In Force Provision contained in Plaintiffs' Selling Agreements. *Compare* Doc. 39-1, *and* Doc. 39-2, *and* Doc. 39-3, *with* Pls. Ex. 4, Shepard Tr., Doc. 150-6, Ex. 22, *and* Pls. Ex. 9, Doc. 150-11, *and* Pls. Ex. 10, Doc. 150-12, *and* Pls. Ex. 11, Doc. 150-13.

Applying Ohio law, the Sixth Circuit in *4218868 Can., Inc. v. Kwasny*, 654 F. App'x 727 (6th Cir. 2016) considered whether available extrinsic evidence clarified the parties' intent in relation to an ambiguous contract. The Appeals Court found that it did not. In so finding, the Sixth Circuit explained that added evidence, such as evidence relating to a party's course of conduct under a form contract with a similarly situated third party, may resolve the ambiguity. *Id.* at 734 ("Additional proceedings could yield evidence supporting a finding that the 'standard terms' under which [the plaintiff] has allowed other employees to exercise options include, for instance, the right to exercise the options up to 30 days *after* termination.").

The same is true here—especially when Ohio National's position on the relevance of its course of conduct in relation to its boilerplate selling agreement is inconsistent. Take for example, the actions and testimony of Thomas Barefield, the Ohio National official that signed the Selling Agreements. Ohio National seeks to rely on Mr. Barefield's testimony to show how Ohio National construed the ambiguous term at the time these agreements were drafted. Barefield Tr., Doc. 153-2, 198:5–18. His testimony, however, is not specific just to Ohio National's intent at the time Plaintiffs' Selling Agreements were prepared—but covers when Ohio National drafted the boilerplate agreement from which those agreements and selling agreements with other similarly situated broker-dealers were derived. The Court sees no basis for allowing Ohio National to offer evidence that is not directly from its dealings with Plaintiffs, while barring Plaintiffs from that same opportunity. *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 815 (6th Cir. 2007) ("[W]here a court considers extrinsic evidence offered by one party on a particular issue, it should likewise consider extrinsic evidence offered by the other party."). Additionally, Ohio National's effort to rely

on Mr. Barefield's testimony about the drafting of the boilerplate agreements shows that the relevant evidence here is interrelated. The distinction Ohio National seeks to draw—negotiations between Ohio National and Plaintiffs on the one hand, and Ohio National's conduct with similarly situated broker-dealers on the other hand—is one that is artificial and a non sequitur.

Accordingly, the Court need not rely solely on Ohio National's course of conduct with Plaintiffs here. The Court may also properly consider how Ohio National interpreted substantially similar terms in selling agreements negotiated and undertaken with other third-party broker-dealers similarly situated to Plaintiffs.

### ii. Application of extrinsic evidence

The Court proceeds to consider the extrinsic evidence the parties presented. To begin, witness testimony does not resolve the ambiguity that exists. Take first, the testimony of Plaintiffs' 30(b)(6) representatives: Aaron Runyon for Avantax and Debra Shannon for Veritas. Ohio National says that the admissions of these representatives confirm the interpretation that the In Force Provision imposes a temporal limitation on when Ohio National must pay trails—*i.e.*, only while the Selling Agreement remains in force.[11]

Not so. An identifiable flaw in Ohio National's reliance on Mr. Runyon's testimony illustrates why Ohio National's argument on this point fails. Mr. Runyon's admission centered on an interpretation that required him to ignore the Survival Provision:

> Q. [P]utting aside section 9 of the main body of the selling agreement, would you agree with me that that language indicates that the selling agreement remaining in force is required for the continued payment of trail commissions?

---

[11] Ohio National does not advance these arguments within the context of extrinsic evidence—but to say that Plaintiffs' proffered interpretation fails for the reasons set forth in *Oppenheimer*. Even so, as set forth *supra*, this Court agrees that consideration of extrinsic evidence is proper based on the ambiguity and will therefore consider the testimony of these individuals within that context.

A. Correct, yes.

Runyon Tr., Doc. 84, 99:4–11. Mr. Runyon, however, recognized as much and added that Avantax's "understanding doesn't interpret [the In Force Provision] in a vacuum," and that it is interpreted "with the broader selling agreement language." *Id.* at 99:15–18. Contrary to Ohio National's assertion, Mr. Runyon's testimony does not establish that the Selling Agreement must remain in force for trail commissions to survive.[12] *See In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d at 280 ("Because we must 'give effect to every provision,' we cannot endorse an interpretation that would read language out of the contract entirely.") (quoting *Sunoco, Inc. (R&M) v. Toledo Edison, Co.*, 129 Ohio St. 3d 397, 408 (2011)).

As to Ms. Shannon's testimony, she raises the issue identified by Judge Cole in *Oppenheimer*: the "statement in the selling agreement that Ohio National *owes* trail commissions while the agreement *is* in force is not the logical equivalent of saying that Ohio National does *not owe* trail commissions while the agreement is *not* in force." *Oppenheimer*, 2021 WL 2819838, at *5. When asked about Veritas' Selling Agreement, Ms. Shannon, who personally signed the agreement on behalf of Veritas, stated that the provision "doesn't say when they won't pay us. It says when they will continue to pay us under the terms of that." Shannon Tr., Doc. 85, 164:2–5.

---

[12] Aaron Runyon was hired by Avantax's predecessor, H.D. Vest, in 2006—three years after Avantax executed its Selling Agreement with Ohio National. Therefore, Mr. Runyon was not involved in negotiating, drafting, or executing that agreement. His testimony likely amounts to no more than the post-hoc contract interpretation Ohio National has cautioned against, *citing Timken Co. v. Robert Bosch, LLC*, No. 5:08CV272, 2009 WL 1373122, at *3 (N.D. Ohio May 15, 2009), but Mr. Runyon's testimony is the only evidence in the record that speaks specifically to Avantax's understanding.

13

Turn next to Thomas Barefield. Mr. Barefield signed the Selling Agreements for Ohio National. Mr. Barefield testified that the purpose of including the In Force Provision in the Selling Agreements was to ensure that Ohio National retained leverage:

> Q. [W]e talked about the leverage that broker-dealers had. As it related to these variable annuities that the company had great success on, did the company build any type of protection in the selling agreement to protect its interest against the broker-dealers?
>
> A. Yes. The ability to terminate the selling agreement which terminated trail commissions was put into the selling -- it was put in the compensation addendum to give us leverage in case we needed it.

Barefield Tr., Doc. 153-2, 198:5–18. Mr. Barefield further testified about conversations that he had with other Ohio National officials regarding the provisions at issue:

> A. And I, in fact, had conversations about six months prior to my retirement in a meeting with the CEO, CFO, and chief risk officer, reminding them again of this feature in the selling agreement, the commission addendum, that we had the ability, if we ever need to execute it, to terminate the contract and eliminate trail commissions.

*Id.* at 236:23–237:5. All of his testimony permits the inference that Ohio National always intended for the In Force Provision to allow Ohio National to cease paying trail commissions to broker-dealers upon a not-for-cause termination. But the Court hesitates to rely solely on the self-serving testimony of Mr. Barefield—especially when it is hard to square his testimony with the testimony of other Ohio National employees and other extrinsic evidence that speaks to Ohio National's intent. *See generally Timken Co. v. Robert Bosch, LLC*, No. 5:08CV272, 2009 WL 1373122, at *4 (N.D. Ohio May 15, 2009) (declining to permit evidence of intent "[i]f the intention is nothing more tha[n] the witness's opinion on what was intended" unless the intention was "reflected in some contemporaneously created document.").

14

For example, contrast Mr. Barefield's testimony with that of Martin Griffin, another former Ohio National official. Mr. Griffin's testimony sheds additional light on how Ohio National operated and communicated with broker-dealers in light of industry practices:

> Q. [I]f someone told you that Ohio National Life has the legal contractual right to terminate the payment of trail commissions given the termination of the selling agreement, it still would be your perspective there is a violation of trust?
>
> A. Yes. I would like to just expound on that for the record.
>
> A. [I] would say industry practice, when you show commission options on annuity products, there's one that's all up front and there's one with a trail. And implicit on that conversation is, in the world I operated, was that trail would survive. That's independent of a legal agreement that said you could kill it. And so we didn't say if you take this one, you take the trail, the trail might go away. We didn't say that ever.
>
> Q. You proceeded on an assumption without looking at the specific language of the selling agreement to determine whether the trail commissions would survive?
>
> A. Correct.

Pls. Ex. 5, Griffin Tr., Doc. 150-7, 379:8–380:2.[13]

Ohio National seeks to exclude the testimony of Martin Griffin because Mr. Griffin did not execute the Selling Agreements at issue and his testimony is therefore outside the scope of proper extrinsic evidence. But other evidence shows that Mr. Griffin executed substantially similar selling agreements on behalf of Ohio National, albeit with other broker-dealers. *See e.g.*, Pls. Ex. 9, Doc. 150-11; Pls. Ex. 10, Doc. 150-12; Pls. Ex. 11, Doc. 150-13. As explained above, Ohio National's contemporaneous dealings with other broker-dealers with which it had substantially similar contracts are relevant to interpreting the contract at

---

[13] Scott Shepard, also of Ohio National, similarly testified that broker-dealers had an expectation of trail commissions, Pls. Ex. 19, Shepard UBS Tr., Doc. 150-21, 215:23–216:2, and that the broker-dealers had a "belief" that trail commissions would continue. *Id.* at 216:17–25.

15

issue. The Court also finds it difficult to brush aside the testimony of Mr. Griffin when he held a similar role to Mr. Barefield. Though Mr. Barefield testified that he participated in "tweaking" basic terms in the boilerplate selling agreement, he admitted that preparation of the boilerplate selling agreement was "mostly handled by [Ohio National's] legal department." Barefield Tr., Doc. 159-1, 117:24–118:20. And notably, no evidence confirms that Mr. Barefield had direct involvement in drafting or negotiating the terms specifically at issue, namely the Survival Provision and the In Force Provision, in relation to Plaintiffs' agreements or with any of the other third-party broker-dealer agreements.

Turning to extrinsic evidence that highlights Ohio National's course of conduct: consider how Ohio National treated related third-party broker-dealers. Mr. Barefield sent letters informing certain broker-dealers with analogous selling agreements to inform them of Ohio National's intent to terminate the agreements. But in those letters, he represented on behalf of Ohio National that the broker-dealers would "continue to receive any trail commissions due on active contracts and the upfront commissions for add-on payments." Pls. Ex. 22, Doc. 150-24, PageID 6045. Apart from that, on one occasion Ohio National replied to an inquiry by a broker-dealer asking what would happen to compensation if the selling agreement were to terminate. Ohio National advised that if the broker-dealer had the standard selling agreement and the agreement was not terminated for cause, the broker-dealer would be entitled to compensation according to the schedules in place at the time premium payments were received.[14] Pls. Ex. 4, Shepard Tr., Doc. 150-6, Ex. 21, PageID 5728–29; Pls. Ex. 28,

---

[14] Ohio National construes this email exchange differently than Plaintiffs, arguing in reply that the exchange "merely indicates…that the language of the applicable commission schedules continues to control following a termination of a selling agreement." Doc. 153, PageID 6784. To the extent that this evidence is open to more than one reasonable interpretation, the Court must construe this, and all the evidence, in a light most favorable to Plaintiffs as the non-moving parties. *Tera LLC*, 2024-Ohio-1945, ¶ 19.

Doc. 150-30. This particular broker-dealer who made the inquiry had a selling agreement with provisions substantially similar to those here. Pls. Ex. 4, Shepard Tr., Doc. 150-6, Ex. 22, PageID 5730–47.

Evidence related to Ohio National's actions upon realizing capital deficiencies and risks within its annuity business is also relevant to this Court's analysis. Pls. Ex. 19, Shepard UBS Tr., Doc. 150-21. Following identification of a pronounced income strain within its Guaranteed Minimum Income Benefit ("GMIB") business in 2016, Ohio National strategized how to create capital relief and remedy the deficits within the operation. *Id.* at 225:8–16. Some proposed solutions included restructuring trail commissions, *see* Pls. Ex. 20, Doc. 150-22, or offering an exchange program, which was seen as "the only way to reduce the trail commissions on the GMIB retained block." Pls. Ex. 19, Shepard UBS Tr., Doc. 150-21, PageID 5993. Ohio National was considering renegotiating trail commissions as of June 2018—just months before Ohio National notified Plaintiffs that the Selling Agreements would be terminated later that year. Pls. Ex. 21, Doc. 150-23, PageID 6016. Though the income situation appeared dire, none of the proposed solutions involved terminating trail commissions—an option that Mr. Barefield said was "leverage" in case they ever needed it. Perhaps Ohio National resorted to termination as a last resort—but it is odd that termination was never mentioned among the slew of other options (some specific to trail commissions and others aimed at different aspects of the business) that were contemplated. While not dispositive, this evidence gives rise to the inference that, before termination, Ohio National understood that it needed to continue paying trail commissions under the Selling Agreements

17

after termination and was therefore desperately trying to remedy capital deficiencies using tactics other than termination of those trails.[15]

Though less persuasive, the Court finds that the survival of customer fees supports a similar inference. Take the mortality and expense ("M&E") risk charges. Actuary Jeff Dellinger explained that M&E risk charges are used to compensate the insurance company—here, Ohio National—for insurance risks, such as the risk of annuitants living too long. Pls. Ex. E, Dellinger Decl., Doc. 150-41, ¶ 20. Ohio National used a portion of M&E risk charges to pay trail commissions. *See* Pls. Ex. 14, Doc. 150-16, PageID 5945; Pls. Ex. 15, Doc. 150-17, PageID 5947; Pls. Ex. 16, Doc. 150-18, PageID 5953. The 12b-1 fees served a similar purpose. Pls. Ex. 16, Doc. 150-18, PageID 5952; Pls. Ex. E, Dellinger Decl., Doc. 150-41, ¶ 21 ("Higher M&E risk charges, higher 12(b)-1 fees, or both are necessary to provide asset-based trail compensation to financial advisors relative to the identical [variable annuity] product without such trails."); ¶ 25 ("The 12(b)-1 fee can and typically is a funding source for [variable annuity] sales compensation, including trail commissions."). But once the Selling Agreements and trail commissions were terminated the M&E risk charges remained the same—that is to say, Ohio National continued charging annuitants the same fees after termination of the broker-dealers' Selling Agreements, and it was well-understood that those fees were, in part, used to pay broker-dealers trail commissions. If Ohio National no longer needed to pay trail commissions, as it claims, this potentially created a windfall for the company, an issue on its radar. *See* Pls. Ex. 17, Doc. 150-19, PageID 5955; *see, e.g.*, *Citizens-*

---

[15] Although the Court cannot consider Ohio National's motive in relation to the breach of contract claim, the Court may properly consider evidence that relates to Ohio National's understanding of its obligations under the Selling Agreements. This evidence seems to be within the realm of that which Judge Cole hypothesized during a prior hearing with counsel. Hearing Tr., Doc. 75, 46:18–47:20.

*Deposit Bank v. Interstate Serv. Ins. Agency, Inc.*, No. 86AP-225, 1988 WL 29613 (Ohio Ct. App. 10th Dist. Mar. 8, 1988) ("[T]he law abhors a forfeiture, particularly when it works to the total disadvantage of an innocent third party and creates an undeserved windfall to a party…"). So much so that Ohio National contemplated how to justify to annuitants charging the same fees when it was no longer paying trail commissions. *Id*; *see also* Pls. Ex. 13, Doc. 150-15. The Court therefore credits Plaintiffs' argument that this supports the desired inference.

Because the contract is ambiguous, the Court has considered extrinsic evidence offered by the parties as to its meaning.[16] The extrinsic evidence does not decisively favor Ohio National. Instead, much like in the contract itself, some evidence favors Plaintiffs, while other evidence favors Ohio National. There is no decisive answer as to how to harmonize the Survival Provision and In Force Provision and resolve the ambiguity in the Selling Agreements, thus summary judgment is inappropriate. *Gencorp, Inc.*, 178 F.3d at 818–19.

## IV. CONCLUSION

Having construed the evidence in the light most favorable to Plaintiffs, as is required on summary judgment, *Cox*, 53 F.3d at 150, the Court finds there remains a genuine issue of material fact as to whether trail commissions survive not-for-cause termination under the Selling Agreements. Accordingly, Ohio National's Motion for Summary Judgment (Doc. 88) is **DENIED**. Ohio National shall be permitted to file a supplemental response to Plaintiffs' Motion for Class Certification (Doc. 80) within twenty-one (21) days. If that occurs, Plaintiffs may reply to Ohio National's supplemental response within fourteen (14) days.

---

[16] Based on the above, the Court need not address all the evidence offered by Plaintiffs. The addressed evidence is sufficient to find that Plaintiffs have shown the existence of a genuine dispute of material fact.

**IT IS SO ORDERED.**[17]

February 7, 2025

                                                Jeffery P. Hopkins
                                                United States District Judge

---

[17] The Court cautions the parties against the overuse of textual modification to emphasize a point or certain phrase. While useful in moderation, repeated use of emphasis—italics, bold, underscoring or any combination thereof—is distracting, and in some ways, is the typographical equivalent of shouting. *See* Matthew Butterick, *Bold or Italic*, Typography for Lawyers, https://typographyforlawyers.com/bold-or-italic.html ("This habit [of overemphasizing] wears down your readers' retinas and their patience.").